## FIRST NATIONAL BANK IN PLANT CITY *v.* DICKINSON, COMPTROLLER OF FLORIDA, ET AL.

No. 19.   Argued October 16, 1969—Decided December 9, 1969*

*Together with No. 34, *Camp, Comptroller of the Currency* v. *Dickinson, Comptroller of Florida, et al.,* also on writ of certiorari to the same court.

*Robert S. Edwards* argued the cause and filed briefs for petitioner in No. 19. *Deputy Solicitor General Springer* argued the cause for petitioner in No. 34. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Ruckelshaus, Robert V. Zener,* and *Robert E. Kopp.*

*William Reece Smith, Jr.,* argued the cause for respondents in both cases. With him on the brief was *V. Carroll Webb.*

*James F. Bell,* by special leave of Court, argued the cause for the National Association of Supervisors of State Banks as *amicus curiae* urging affirmance in both cases. With him on the brief was *Brian C. Elmer.*

*E. Barrett Prettyman, Jr.,* filed a brief for the First National Bank of Cornelia, Georgia, et al. as *amici curiae* urging reversal in both cases.

Briefs of *amici curiae* urging affirmance in both cases were filed by *Arthur K. Bolton,* Attorney General of Georgia, *Harold N. Hill, Jr.,* Executive Assistant Attorney General, *J. Robert Coleman* and *Robert J. Castellani,* Assistant Attorneys General, *Robert Morgan,* Attorney General of North Carolina, and *Millard R. Rich, Jr.,* Assistant Attorney General, for the States of Georgia and North Carolina, and by *Horace R. Hansen* for the Independent Bankers Association of America et al.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

In these cases we are called upon to construe § 7 of the McFadden Act of 1927, 44 Stat. 1228, as amended, 12 U. S. C. § 36, as it relates to the definition of a branch bank for the purpose of determining the scope of branch banking available to a national bank in a State that prohibits branches for state banks.

12 U. S. C. § 36 (f) provides in pertinent part:

"(f) The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or money lent."

Florida prohibits all branch banking by state chartered banks; by statute a Florida bank may "have only one place of doing business," and all the business of the

bank is to be carried on at that place "and not else-where." [1] The issue must be resolved by determining what constitutes a "branch" or "additional office"; there is a threshold question of the extent to which this is governed by federal law.

The First National Bank in Plant City, Florida, is a national banking association organized and operated pursuant to the National Bank Act, 12 U. S. C. § 21 *et seq.;* it sought and received from the United States Comptroller of the Currency permission to operate two services for the convenience of customers; one was an armored car messenger service and the other an off-premises receptacle for the receipt of packages containing

---

[1] Florida Stat. § 659.06 (1)(a) (1965) provides:

"659.06 *Place of transacting business; school savings; drive-in facilities.—*

"(1)(a) Any bank or trust company shall have only one place of doing business, which shall be located in the community specified in its original articles of incorporation, and the business of the bank or trust company shall be transacted at its banking house so located in said community specified, and not elsewhere. . . .

.        .        .        .        .

"(2) With the prior written approval of the commissioner a bank may operate a drive-in facility or walk-up facility providing one or more tellers to serve patrons in vehicles and on foot. It shall not be necessary that such facility be a part of or physically connected to the main banking room or building of the bank if the facility is located on the property on which the main banking house is situated or on property contiguous thereto. Property which is separated from the property on which the main banking house is situated only by a street, walkway or alleyway shall, for the purposes of this subsection, be deemed contiguous to the property on which the main banking house is situated.

"The operation of any drive-in or walk-up facility which is not located on the property on which the main banking house is situated or on property contiguous thereto shall constitute a violation of subsection (1); provided, however, subsection (2) shall not apply to any facilities existing on or prior to January 1, 1965."

cash or checks for deposit. The Comptroller's letter authorizing the armored car messenger service relied upon paragraph 7490 of the Comptroller's Manual for National Banks,[2] a relatively recent ruling which specifically authorizes such a service. A second letter authorizing construction of an off-premises receptacle authorized such a service "as an incident to" the bank's ordinary business. Both letters contained explicit instructions to First National designed to insure that deposits so received would not become bank liabilities until actually in the hands of the bank teller at the chartered office or regular "banking house"; and that checks cashed for customers would be deemed paid at the bank when the cash was handed to the messenger, not when the cash was delivered to the customer by the armored car teller.

Relying on these letters, First National offered an armored car service and a secured receptacle for receipt of monies intended as deposits. The bank advertised "Full Service Banking at your doorstep . . ." and a "mobile drive-in . . . where customers may be served . . . ." A more detailed examination of the services shows that customers having an account with First National could, upon signing a "Comprehensive

---

[2] Comptroller's Manual for National Banks ¶ 7490.

*"Messenger Service*

"To meet the requirements of its customers, a national bank may provide messenger service by means of an armored car or otherwise, pursuant to an agreement wherein it is specified that the messenger is the agent of the customer rather than of the bank. Deposits collected under this arrangement are not considered as having been received by the bank until they are actually delivered to the teller at the bank's premises. Similarly, a check is considered as having been paid at the bank when the money is handed to the messenger as agent for the customer."

Dual Control Contract," [3] arrange to have the armored car call at their place of business to pick up cash and checks for deposit, or to bring cash to them in exchange for checks delivered to the armored car teller. The contract provided that in each situation the bank's armored car messenger would be the agent of the customer. Additionally, proffered deposits were accompanied by a transmittal slip upon which the customer itemized the funds being deposited in the same manner as with deposits made at the chartered office of the bank. The transmittal slip contained a "Contract" which provided that in this off-premises transaction the bank was the agent of the customer, and that "the transmittal of said currency, coin and checks, shall not be deemed to be a deposit until delivered into the hands of the bank's tellers at the said banking house." [4] Sums

[3] *"Comprehensive Dual Control Contract*

"As agent for the undersigned depositor, The First National Bank Messenger will transport monies of the depositor to and from the banking house.

"Under the Comprehensive Dual Control Contract, all monies, transported solely in padlocked money bags furnished by bank, shall be opened only under the dual control of two bank's tellers. For this purpose, bank will retain a pass key for depositor's bag(s); a key for each bag will be furnished depositor. The depositor expressly authorizes the service described and agrees to accept the bank's count of monies as final.

"The First National Bank in Plant City maintains hazard insurance covering holdup, employee fidelity, etc., for the benefit of the depositor for all amounts delivered to bank's messenger for delivery to bank and for all amounts requisitioned by depositor for delivery from bank to depositor. Unless otherwise authorized in writing, only the undersigned shall be permitted to receipt the bank's messenger for monies delivered to depositor. . . ."

[4] *"Contract*

"First National Bank, Plant City, Fla., as messenger and agent for Principal named on front side hereof, agrees to transmit

of cash for transmission to the customer were accompanied by a charge slip indicating that the customer's account had been charged for the amount of the order.

The armored car was owned and controlled by the bank; the teller and driver-guard in the car were bank employees. The bank paid the cost of armored car operations and assumed complete responsibility for the monies, checks, and deposits during transit by means of an insurance policy bought and paid for by it to protect the customer and the bank. The armored car service operated six days per week in Plant City and the surrounding trade area in Hillsborough and Polk Counties. The armored car had a plate glass window, a sliding drawer, and a counter on one side where customers might be served. The truck bore the name of the bank and had two-way radiophone communication with the bank. All movements and routing of the armored car were directed by the bank. First National handled about $1,000,000 per week through the armored car.

The stationary off-premises receptacle for receipt of monies intended for deposit was located in a shopping center one mile from First National's banking house in a space leased by the bank. The facility consisted of a secured receptacle for monies and night bags, together

the currency, coin and checks detailed on the front side hereof to the bank's offices at 302 West Haines Street, Plant City, Fla. for deposit to Principal's account. It is agreed and understood by Principal and the bank that in transmitting said currency, coin and checks, the bank is acting solely as agent for said Principal and that the transmittal of said currency, coin and checks, shall not be deemed to be a deposit until delivered into the hands of the bank's tellers at the said banking house.

"The bank maintains hazard insurance covering holdup, employee fidelity, etc. for the protection of the Principal for all amounts and items delivered to the bank's messenger by said Principal."

with a writing table supplied with envelopes and transmittal slips identical to those used by the armored car messenger service. The envelopes recited that the funds transported were accepted in accordance with the contract printed on the transmittal slip. A sign at the receptacle recited that the messenger who collected the funds acted as agent for the customer, that funds would not be deemed to have been deposited until delivered at the bank's premises, and that insurance on the funds was provided by the bank. Customers maintaining an account with the bank who had signed the Comprehensive Dual Control Contract were issued a key to open the off-premises depository to drop off the night pouches in the receptacle. The armored car serviced the receptacle daily. The armored car teller, upon making pickups of such night pouches, promptly identified all monies and other items placed in the depository and immediately recorded them by the depositor's number. The driver-guard verified all items collected by the teller and signed the written bank record identifying the monies obtained at the stationary depository.

On September 28, 1966, the Comptroller of the State of Florida, respondent herein, addressed a letter to First National advising it that the proposed depository then under construction and the provision of an armored car messenger service would each violate the prohibition under Florida law against branch banking. The letter requested that First National cease and desist all such operations.

First National then sued in the United States District Court for the Northern District of Florida seeking declaratory and injunctive relief against respondent. The United States Comptroller intervened as plaintiff on the side of First National; several state banks intervened to support the Florida Comptroller. The District Court granted judgment for petitioners, 274 F.

Supp. 449 (D. C. N. D. Fla. 1967). The Court of Appeals reversed, 400 F. 2d 548 (C. A. 5th Cir. 1968). We affirm the Court of Appeals.

*Federal Statute and Policy*

The conditions under which national banks may establish branches are embodied in § 7 of the McFadden Act, 44 Stat. 1228, as amended, codified in 12 U. S. C. § 36. One such condition is that a "branch" may be established only when, where, and how state law would authorize a state bank to establish and operate such a branch, 12 U. S. C. § 36 (c).[5] *First National Bank of Logan* v. *Walker Bank & Trust Co.,* 385 U. S. 252 (1966).

We have noted that the State of Florida permits no branch banking under a statute providing that banks are to "have only one place of doing business"; the business of the bank may be transacted at that place "and not elsewhere." [6] The parties agree generally that the McFadden Act permits national banks to branch if and only if the host State would permit one of its own banks to branch; the Florida Bank Comptroller insists that the State of Florida unequivocally forbids off-premises bank-

---

[5] The National Bank Act, 44 Stat. 1228, 12 U. S. C. §§ 36 (c) (1) and (2) provides:

"(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks."

[6] See n. 1, *supra.*

ing of any kind. Thus the lines are clearly drawn; the question presented is whether the activities of First National authorized by the United States Comptroller are branch banking.

At the outset we note that, while Congress has absolute authority over national banks, the federal statute has incorporated by reference the limitations which state law places on branch banking activities by state banks. Congress has deliberately settled upon a policy intended to foster "competitive equality." *Walker Bank,* 385 U. S., at 261. State law has been utilized by Congress to provide certain guidelines to implement its legislative policy.

We need not review the legislative history of the McFadden Act and prior national bank legislation as it relates to this problem; that task was performed by Mr. Justice Clark in *Walker Bank, supra,* where a unanimous Court noted that the McFadden Act was a response to the competitive tensions inherent in a dual banking structure where state and national banks coexist in the same area. That Act reflects the congressional concern that neither system have advantages over the other in the use of branch banking. A House Report shows that in 1926 there was congressional concern to protect national banks from the unrestricted branch bank competition of state banks:

> "The present situation is intolerable to the national banking system. The bill proposes the only practicable solution by stopping the further extension of state-wide branch banking in the Federal reserve system by State member banks and by permitting national banks to have branches in those cities where State banks are allowed to have them under State laws." H. R. Rep. No. 83, 69th Cong., 1st Sess., 7 (1926).

The bill to which this report was addressed failed to pass in the Senate. In tracing the legislative history of the bill which passed the following year, this Court in *Walker Bank, supra,* observed:

> "The intent of the Congress to leave the question of the desirability of branch banking up to the States is indicated by the fact that the Senate struck from the House bill the time limitation, thus permitting a subsequent change in state law to have a corresponding effect on the authority of national banks to engage in branching. The Senate Report concluded that the Act should permit 'national banks to have branches in those cities where State banks are allowed to have them under State laws.'" 385 U. S., at 258, quoting from S. Rep. No. 473, 69th Cong., 1st Sess., 14 (1926).

At the time of its enactment into law, Representative McFadden stated that:

> "As a result of the passage of this act, the national bank act has been so amended that *national banks* are able to meet the needs of modern industry and commerce and *competitive equality* has been established . . . ." 68 Cong. Rec. 5815 (1927). (Emphasis supplied.)

When the economic depression of the 1930's brought on widespread bank failures, Congress responded by amending the McFadden Act with the passage of the Banking Act of 1933, which further strengthened the policy of competitive equality. Some Members argued that bank failures were due to the undercapitalization of small rural banks and sought to authorize national banks to engage in branch banking without regard to state law; but that approach was rejected. As finally passed, the Act was reported to the House by one of

the members of the Conference Committee, Representative Luce, with this statement:

> "In the controversy over the respective merits of what are known as 'unit banking' and 'branch banking' . . . branch banking has been steadily gaining in favor. It is not, however, here proposed to give the advocates of branch banking any advantage. *We do not go an inch beyond saying that the two ideas shall compete on equal terms and only where the States make the competition possible by letting their own institutions have branches.*" 385 U. S., at 260, quoting from 77 Cong. Rec. 5896 (1933). (Emphasis supplied.)

The policy of competitive equality is therefore firmly embedded in the statutes governing the national banking system. The mechanism of referring to state law is simply one designed to implement that congressional intent and build into the federal statute a self-executing provision to accommodate to changes in state regulation.

We reject the contention made by *amicus curiae* National Association of Supervisors of State Banks to the effect that state law definitions of what constitutes "branch banking" must control the content of the federal definition of § 36 (f).[7] Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated, *Walker Bank, supra,* for in § 36 (c) Congress entrusted to the States the regulation of branching as Congress then conceived it. But to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Con-

---

[7] In their briefs before this Court, the litigants are all in agreement that federal law alone applies to resolve the threshold question whether the challenged activity falls within the definition of "branch." Reply Brief for the Comptroller of the Currency 2; Respondents' Brief 41, 44.

gress did not intend such an improbable result, as appears from the inclusion in § 36 of a general definition of "branch." On this point the language of the Court of Appeals perhaps overstated the relation of state law to the problem, since the threshold question is to be determined as a matter of federal law, having in mind the congressional intent that so far as branch banking is concerned "the two ideas shall compete on equal terms and only where the States [allow] their own institutions [to] have branches." In short, the definition of "branch" in § 36 (f) must not be given a restrictive meaning which would frustrate the congressional intent this Court found to be plain in *Walker Bank, supra.*[8]

### Federal Definition of Branch Bank

Against this background, we turn to the question whether the off-premises business activities conducted by First National amounted to "branch" banking within the meaning of the McFadden Act. Since national banks are "necessarily subject to the paramount authority of the United States," *First National Bank in St. Louis* v. *Missouri,* 263 U. S. 640, 656 (1924), we consult that part of the McFadden Act that defines the term "branch." 12 U. S. C. § 36 (f) provides:

> "(f) The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or money lent."

---

[8] Representative McFadden described the definitional section of the Act as providing that:

"Any place outside of or away from the main office where the bank carries on its business of receiving deposits, paying checks, lending money, or transacting any business carried on at the main office, is a branch." 68 Cong. Rec. 5816 (1927).

Although the definition may not be a model of precision, in part due to its circular aspect, it defines the minimum content of the term "branch"; by use of the word "include" the definition suggests a calculated indefiniteness with respect to the outer limits of the term. However, the term "branch bank" at the very least includes *any* place for receiving deposits or paying checks or lending money apart from the chartered premises; it may include more. It should be emphasized that, since § 36 (f) is phrased in the disjunctive, the offering of any one of the three services mentioned in that definition will provide the basis for finding that "branch" banking is taking place. Thus not only the taking of deposits but also the paying of checks or the lending of money could equally well provide the basis for such a finding. Although the District Court briefly discussed the possibility that checks were being paid, we confine ourselves to the question of whether deposits were received. Specifically, we must resolve the question whether the mobile armored car service and stationary deposit receptacle singly or together fall within the ambit of that section. As to the receiving of deposits, the functions of the two facilities are essentially the same, hence they may be considered together.

First National and the Comptroller of the Currency urge that the challenged activity does not amount to branch banking under § 36 (f). First National relies heavily, if indeed not entirely, upon carefully drawn contracts with its customers who use armored car or deposit receptacle services. The bank urges that, "deposit" being a word of art, the determination of when a deposit is made is not a casual one inasmuch as that determination fixes important legal relationships of the parties.

The bank also urges that creation of a deposit being purely a matter of intent, the issue is governed exclu-

sively by the private contract. Since these contracts must be interpreted under state law, the argument runs, no "deposit" is actually received as such until monies delivered to the armored car or the receptacle are physically delivered into the hands of a bank teller at the chartered premises. Until such time the bank may not, under the contracts, be held to account for the customer's funds.

We have no difficulty accepting the bank's argument that the debtor-creditor relationship is a creature of contract and that the parties can agree that until monies are physically delivered to the bank no deposit will be credited to the customer's account.[9] We are satisfied, however, that the contracts have no significant purpose other than to remove the possibility that the monies received will become "deposits" in the technical and legal sense until actually delivered to the chartered premises of the bank.

We do not challenge the right of the contracting parties to fix rights and risks as between themselves; nothing in the law precludes the parties from agreeing, for example, that the bank does not assume the status of bailee, with liability for loss of money in transit. But while the contracting parties are free to arrange their private rights and liabilities as they see fit, it does not follow that private contractual arrangements, binding on the parties under state law, determine the meaning of the language or the reach of § 36 (f).

Because the purpose of the statute is to maintain competitive equality, it is relevant in construing "branch" to consider, not merely the contractual rights and liabilities created by the transaction, but all those aspects of the transaction that might give the bank an advantage

---

[9] 5A A. Michie on Banks and Banking §§ 4a, 5, 14, 15 and 17 (1950); 10 Am. Jur. 2d Banks § 358 (1963); 9 C. J. S. Banks and Banking § 269 (1938).

in its competition for customers. Unquestionably, a competitive advantage accrues to a bank that provides the service of receiving money for deposit at a place away from its main office; the convenience to the customer is unrelated to whether the relationship of debtor and creditor is established at the moment of receipt or somewhat later.

We need not characterize the contracts as a sham or subterfuge in order to conclude that the conduct of the parties and the nature of their relations bring First National's challenged activities within the federal definition of branch banking. Here, penetrating the form of the contracts to the underlying substance of the transaction, we are satisfied that at the time a customer delivers a sum of money either to the armored truck or the stationary receptacle, the bank has, for all purposes contemplated by Congress in § 36 (f), received a deposit. The money is given and received for deposit even though the parties have agreed that its technical status as a "deposit" which may be drawn on is to remain inchoate for the brief period of time it is in transit to the chartered bank premises. The intended deposits are delivered and received as part of a large-scale continuing mode of conducting the banking business designed to bring basic bank services to the customers.

Since the putative deposits are in fact "received" by a bank facility apart from its chartered place of business, we are compelled, in construing § 36 (f), to view the place of delivery of the customer's cash and checks accompanied by a deposit slip as an "additional office, or . . . branch place of business . . . at which deposits are received." [10]

---

[10] We need not here try to draw fine distinctions around relatively isolated, sporadic, and inconsequential transactions where a bank employee carries cash to a customer to cash a check, or secures a signature on a note in exchange for a check delivered off premises.

Here we are confronted by a systematic attempt to secure for national banks branching privileges which Florida denies to competing state banks. The utility of the armored car service and deposit receptacle are obvious; many States permit state chartered banks to use this eminently sensible mode of operations, but Florida's policy is not open to judicial review any more than is the congressional policy of "competitive equality." Nor is the congressional policy of competitive equality with its deference to state standards open to modification by the Comptroller of the Currency.[11]

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

It will come as a shock, where common sense is the guide, to learn that an armored car picking up merchants' cash boxes and checks is a branch bank. Conceivably a bank could use an armored car as a place of business by stationing it at designated places during designated hours for opening accounts, receiving deposits, making

---

[11] In 1963 Comptroller Saxon, author of ¶ 7490 in the Comptroller's Manual for National Banks, *supra,* n. 2, declared that "[t]he branching powers of National Banks should, in my judgment, not be limited according to those policies which the individual States find appropriate to meet their local needs through State-chartered banks." Saxon, Branching Powers and the Dual Banking System, 101 Comp. Currency Ann. Rep. 316, 318 (1963).

During the course of the congressional debates over what became the McFadden Act, Representative Stevenson remarked:

"[Y]ou have branches in the Federal reserve system established by the dictum of the Comptroller of the Currency, who has assumed to say that he can allow a national bank to establish as many agencies for receiving deposits and paying checks as he sees fit. . . . I will show presently that we cut that out, root and branch." 66 Cong. Rec. 1627.

loans, and the like. But no armored car was so used in these cases.

Federal law stated in the McFadden Act, 12 U. S. C. § 36 (f), defines "branch" as any facility "at which deposits are received, or checks paid, or money lent." And Congress provided that national banks may establish "branches" whenever, wherever, and however state banks may do so. *First National Bank of Logan* v. *Walker Bank & Trust Co.,* 385 U. S. 252, 261–262. The opinion of the Court leaves the impression that the McFadden Act created "competitive equality" between national and state banks across the board. But as we stated in the *Walker Bank* case, that Act "intended to place national and state banks on a basis of 'competitive equality' *insofar as branch banking was concerned."* *Id.,* at 261. (Italics added.) There was no other or additional overriding principle of "competitive equality" that limited off-premises services of national banks to those that state banks could provide.

Among those off-premises activities of national banks was the furnishing of armored car messenger services, which, we are advised by the Comptroller of the Currency, antedated by many years the 1927 McFadden Act. One can read the legislative history of the Act without finding any hint that Congress was providing "competitive equality" as respects armored car messenger services.

As stated by the District Court, "If no branch is involved here, there is no requirement that the national bank's practice must conform to that of the state banks." 274 F. Supp. 449, 453.

The services rendered in these cases were undertaken only after approval by the Comptroller of the Currency who attached a condition that "the messenger is the

140

agent of the customer rather than of the bank."[1]  I thought it was elemental law that a bank deposit cannot arise without some unequivocal act whereby both parties express their consent to the creation of the status of debtor and creditor.  The District Court, which is a more faithful exponent of local law than are we, so ruled.  274 F. Supp., at 454.  Certainly the Comptroller, who is the supervisory agent for policing § 36, has some authority to define "deposits" as used in § 36 (f), and this case affords no excuse for disparaging him.  This is not a government by administrative *fiat;* the exercise of administrative discretion is normally subject to judicial review.  When it comes to an administrator's construction of a statutory term in the law that he supervises, however, we have allowed his expertise great leeway in the definition,[2] only rarely disturbing it.

---

[1] Par. 7490, Comptroller's Manual for National Banks.  This paragraph provides:

"To meet the requirements of its customers, a national bank may provide messenger service by means of an armored car or otherwise, pursuant to an agreement wherein it is specified that the messenger is the agent of the customer rather than of the bank.  Deposits collected under this arrangement are not considered as having been received by the bank until they are actually delivered to the teller at the bank's premises.  Similarly, a check is considered as having been paid at the bank when the money is handed to the messenger as agent for the customer."

[2] See *SEC* v. *New England Electric System,* 384 U. S. 176, 185; *Udall* v. *Tallman,* 380 U. S. 1, 16; *United States* v. *Drum,* 368 U. S. 370, 374–376; *NLRB* v. *Coca-Cola Bottling Co.,* 350 U. S. 264, 269; *Unemployment Compensation Comm'n* v. *Aragon,* 329 U. S. 143, 153–154; *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 130–131; *Gray* v. *Powell,* 314 U. S. 402, 411–413; *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 145–146; Jaffe, Judicial Review: Question of Law, 69 Harv. L. Rev. 239, 261 (1955); Nathanson, Administrative Discretion in the Interpretation of Statutes, 3 Vand. L. Rev. 470, 490–491 (1950).

The Comptroller's definition of "deposits" should be honored here. For where the risk is on the customer that his cash and checks may never reach the bank, he cannot in good sense or in good law be deemed to have made a deposit while the funds are in transit.

By the standards of administrative law honored until today, the Comptroller was justified in defining "deposits" to make the armored cars messengers of the customers, not agents of the bank. So whether common sense or the law is our standard, the judgment of the Court of Appeals should be reversed. The Comptroller's authorization of these armored car activities as being permissible under the National Bank Act was an interpretation of the Act which, as MR. JUSTICE STEWART says in his dissent, cannot be said to be "not a reasonable one."

MR. JUSTICE STEWART, dissenting.

I wholly agree with the Court that federal law is to be applied in determining whether the activities of a national bank constitute branch banking under the exclusive definition contained in the National Bank Act, 12 U. S. C. § 36 (f). Whether the activities here in question constitute branch banking under that standard seems to me an extremely close question. That being so, I would defer to the determination of the Comptroller of the Currency. He is the official charged with administering these provisions of the Act, and I cannot say his determination was not a reasonable one. See *Udall* v. *Tallman,* 380 U. S. 1, 16–18.