TRI-CITY BANK OF WARREN v DEPARTMENT OF COMMERCE, FINANCIAL INSTITUTIONS BUREAU

Banking—Branch Banking.

A corporation formed when plaintiff bank moved out of its office when granted permission to open a bank in a neighboring city constituted a "branch" bank as defined by the Banking Code of 1969 even though that corporation was formally an entity separate from the plaintiff bank and remained liable to its own customers until its services, performed for plaintiff bank pursuant to a formal contract, were cleared by the plaintiff bank where the office used by the separate corporation was the same one vacated by the plaintiff bank with the same physical features except that the bank's name had been removed, teller windows and a vault were retained, the separate corporation transacted deposits and withdrawals for savings and checking accounts in the plaintiff bank and handled certain aspects of loan transactions between plaintiff bank and its customers, the plaintiff bank covered the employees of the separate corporation under a surety bond and withheld income tax from their checks, the plaintiff bank purchased insurance to protect itself and its customers for trans-

REFERENCE FOR POINTS IN HEADNOTE
10 Am Jur 2d, Banks §§ 324–329.

actions between the separate corporation and the customers, and the tellers and manager of the separate corporation were paid by the plaintiff bank (MCLA 487.305[d]).

Appeal from Macomb, Alton H. Noe, J. Submitted Division 2 January 10, 1972, at Lansing. (Docket No. 11574.) Decided February 25, 1972. Leave to appeal denied, 387 Mich 773.

Complaint by Tri-City Bank of Warren against the Financial Institutions Bureau, Department of Commerce, and Robert P. Briggs, Commissioner of the Financial Institutions Bureau, seeking review of the decision of the Commissioner ordering plaintiff to cease the operation of a branch bank. Affirmed. Plaintiff appeals. Affirmed.

*Armand D. Bove,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *E. Boomie Mikrut,* Assistant Attorney General, for defendants.

Before: DANHOF, P. J., and T. M. BURNS and O'HARA,* JJ.

O'HARA, J. The Commissioner of the Financial Institutions Bureau of Michigan's Department of Commerce determined, after a hearing held January 8, 1970, that plaintiff was violating § 171 of the Banking Code of 1969 (MCLA 487.471; MSA 23.710 [171]).

This act prohibits the establishment of a branch bank in a city or village in which a state or national bank or branch thereof is then in operation. The commissioner determined that the plaintiff was oper-

_____
* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

ating a branch bank in the city of Southgate, Michigan, where the Security Bank & Trust Company also has its main office and two branches. The commissioner ordered the plaintiff to cease and desist its operation of a branch bank in Southgate, acting pursuant to his authority under § 35 of the Banking Code of 1969 (MCLA 487.335; MSA 23.710 [35]). The court below affirmed the findings of the commissioner and this appeal followed. The cease and desist order has been stayed pending our decision.

The only issue raised on appeal asks whether or not the activities practiced by the plaintiff constitutes prohibited branch banking.

Section 5(d) of the Banking Code of 1969 (MCLA 487.305[d]; MSA 23.710[5] [d]) defines a branch bank as follows:

" 'Branch' means any branch bank, branch office, branch agency, additional office or any branch place of business at which deposits are received or checks paid or money lent."

In interpreting this definition, we take guidance from the United States Supreme Court which recently had an occasion to interpret an identically worded definition of a branch bank contained in 12 USC 36(f). The result reached in *First National Bank v Dickinson*, 396 US 122; 90 S Ct 337; 24 L Ed 2d 312 (1969), is relevant to the case at bar. A comparison between the factual situations in the two cases makes this readily apparent.

In *Dickinson*, a national bank sought to maintain an armored car service and an off-premises receptacle service for the receipt of its customer's cash and check deposits. The armored car picked up such deposits at the places of business of the bank's customers. The stationary, vault-like receptacle was located in a shopping center, and the bank's

customers could take their cash or checks to this location to make deposits, including night deposits by customers having a key. The customers received a transmittal slip for their deposits which in effect was a contract stating that a deposit was not deemed made until the cash or checks were delivered to the bank. Thus, theoretically, both the armored car service and shopping center service were agents of the *customer* rather than of the bank, liable to the customer until the cash or checks were actually delivered. In reality, however, the bank assumed the risk of the loss of the deposit while in transit by purchasing appropriate insurance. Furthermore, both the armored car and the shopping center receptacle were operated by and at the direction of employees of the bank.

The United States Supreme Court held that these activities constituted branch banking as defined by the Federal act. The court was not persuaded that the private contract between the bank and its customers—to the effect that no deposits were made until the monies were actually received at the bank—in any way changed the basic character of the branch banking activities practiced:

"But while the contracting parties are free to arrange their private rights and liabilities as they see fit, it does not follow that private contractual arrangements, binding on the parties under state law, determine the meaning of the language or the reach of § 36(f).

"Because the purpose of the statute is to maintain competitive equality, it is relevant in construing 'branch' to consider, not merely the contractual rights and liabilities created by the transaction, but all those aspects of the transaction that might give the bank an advantage in its competition for customers. Unquestionably, a competitive advantage accrues to a bank that provides the service of re-

ceiving money for deposit at a place away from its main office; the convenience to the customer is unrelated to whether the relationship of debtor and creditor is established at the moment of receipt or somewhat later." 396 US at pp 136–137; 90 S Ct at pp 344–345; 24 L Ed 2d at pp 321–322.

Striking parallels exist in the present case. Plaintiff moved out of its Southgate office when granted permission to open a bank in Warren but its ties with its Southgate customers were never completely severed. Plaintiff bank continued to maintain a lease on the Southgate premises. The physical features of this office were kept the same except for the removal of the bank's name. Teller windows and a vault were maintained on the premises. Tellers and a manager remained at the Southgate office. All were paid by the plaintiff. The bank covered them under a surety bond and deducted their withholding for income tax purposes.

Working through Tri-City Services, Inc., with whom the plaintiff appears to have a contract, the employees at the Southgate office not only received cash and check deposits for savings and checking accounts with the plaintiff, but cashed checks, paid withdrawals, and handled various aspects of loan transactions for the plaintiff. While Tri-City Services, Inc., was titularly and contractually responsible for such activities until cleared by the plaintiff, in fact the plaintiff paid for the insurance necessary to protect both itself and its Southgate customers throughout these transactions. It further appears that some of the money received in deposit at the Southgate office was never transferred to the plaintiff, but was used at the discretion of the Southgate employees for the payment of checks and withdrawals and for the making of change for the Southgate customers.

The Attorney General, on behalf of the commissioner, argued that Tri-City Services, Inc., and Tri-City Bank of Warren, though two different corporations, were in fact the same entity and that in such circumstances courts should not hesitate to "pierce the corporate veil."

Under the facts of this case, if a corporate veil was created it was so flimsy as to amount almost to bi-corporate indecent exposure.

We are in complete accord with the succinct findings and conclusions of the learned trial judge:

"The operations of * * * Tri-City Services, Inc., was in fact that of the Tri-City Bank and * * * the various instrumentalities used by the Tri-City Services, Inc., to avoid the appearance of a banking corporation are mere subterfuges * * *. The conclusion from the record is clear. Plaintiff bank was engaged in the illegal operation of a branch bank."

We agree.

The stay order heretofore issued is dissolved.

The order of the Commissioner of Financial Institutions is affirmed. Costs to the appellee.

All concurred.