**Annie M. DiPIERRO, Executrix of the Estate of Walter R. Train**

v.

**Evelyn DUDLEY.**

Supreme Judicial Court of Maine.

April 2, 1974.

Nisbet & MacNichol, by Alexander MacNichol, South Portland, for plaintiff.

Gagan, Trynor, Berry & Cummings, by James E. Gagan, Portland, for defendant; William E. McKinley, Portland, Amicus Curiae.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

ARCHIBALD, Justice.

Annie M. DiPierro, the duly appointed and qualified Executrix under the will of Walter R. Train, instituted an action against the defendant for the purpose of recovering certain monies in the hands of the defendant which allegedly were the property of the Executrix.

The case was submitted to a Justice of the Superior Court upon an agreed statement of facts.

Prior to his decease Walter R. Train was an employee of John J. Nissen Baking Company and a member of the Nissen Employees Federal Credit Union, a corporation organized and operated under the provisions of the Federal Credit Union Act, 12 U.S.C.A. § 1751 et seq. Using only his own funds Mr. Train opened a joint share account in which he and his niece, the defendant Evelyn Dudley, were described as joint owners. Following Mr. Train's death the defendant withdrew the account and refused, after demand, to return the fund to the plaintiff Executrix.

In the agreed statement the parties framed the issue as follows:

"Whether or not the Defendant, Evelyn Dudley, became legally entitled to the funds on deposit in said joint share account as the surviving joint owner upon the death of Walter R. Train as against the estate of the deceased?

If the answer to the above is in the affirmative, Judgment is to be for the Defendant. If the answer to the above is in the negative, Judgment is to be for the Plaintiff in the amount ·of $7,151.06 plus interest from the date of the Complaint, May 9, 1972."

The Justice below ordered judgment for the defendant, and the plaintiff appeals. We sustain the appeal.

We must determine whether a niece may receive the proceeds of a joint account pursuant to 12 U.S.C.A. § 1759 despite the provisions of 9 M.R.S.A. § 515(2), under which a niece is not recognized as within that degree of relationship which allows

the ownership of a bank account to be transferred to the surviving joint tenant.

The Federal Credit Union Act of 1934 provides for the charter of federal credit unions which are cooperative associations organized for the purpose of promoting thrift among members and providing members with a source of installment credit. Initially, the Act limited its benefits to those who were member shareholders. In 1946 Section 1759 was amended by adding thereto the following:

"Shares may be issued in joint tenancy with right of survivorship with *any* persons designated by the credit union member, but no joint tenant shall be permitted to vote, obtain loans, or hold office, unless he is within the field of membership and is a qualified member." (Emphasis supplied.)

So that the issue may be sharply in focus we quote the exact language of 9 M. R.S.A. § 515(1)(2):

"1. To whom paid. When a deposit has been made or shall hereafter be made in any bank, savings bank or trust company, or shares have been already issued or shall be hereafter issued in any loan and building association transacting business in this State, in the names of 2 or more persons, payable to either, or payable to either or the survivor, such deposit, or any part thereof, or the interest or dividends thereon may be paid to any or either of said persons, whether the other or others be living or not, or to the legal representative of the survivor of said persons, and the receipt or acquittance of the persons to whom said payment is so made shall be a valid and sufficient release and discharge to such bank, savings bank, trust company or loan and building association for any payment so made.

2. Property of survivor. All such accounts, whenever opened, or such shares and accounts in loan and building associations whenever issued, payable to either or the survivor, who are *husband and wife,* up to, but not exceeding an aggregate value of $10,000, and payable to either of 2 or more or the survivor of those persons who are *parent and child, grandparent and grandchild,* or *brothers and sisters,* up to, but not exceeding an aggregate value of $5,000 including interest and dividends, in the name of the same persons in all banks, savings banks, loan and building associations or trust companies within this State shall, in the absence of fraud or undue influence, upon the death of any such persons, become the sole and absolute property of the survivor or survivors, even though the intention of all or any one of the parties be in whole, or in part, testamentary and though a technical joint tenancy be not in law or fact created. . . ."[1] (Emphasis supplied.)

Appellant argues that Section 515 controls the right of the plaintiff to maintain this action despite Section 1759 of the Federal Credit Union Act.

■ It is apparent that the Justice below acted on the theory that this federal legislation superseded the restrictions of 9 M.R.S.A. § 515(2). We do not agree with this assumption.

Neither party has cited any authority dealing specifically with the impact of the provision of the Federal Credit Union Act on any state law dealing with joint share accounts in credit unions. Our independent research has found no such specific authority.[2]

We do not believe that Congress intended to create a unique type of joint tenancy which contravenes the local rules govern-

---

1. 9 M.R.S.A. § 2647 brings credit unions within the scope of 9 M.R.S.A. § 515.

2. *But see* Lau v. Lau, 304 Mich. 218, 7 N.W. 2d 278 (1943); *see also* Flood v. City Nat. Bank of Clinton, 220 Iowa 935, 263 N.W. 321 (1935), cert denied 298 U.S. 666, 56 S.Ct. 749, 80 L.Ed. 1390 (1936); McKee & Company v. First National Bank of San Diego, 265 F.Supp. 1 (S.D.Cal.1967), aff'd 397 F.2d 248 (9th Cir. 1968).

ing the disposition of property so held. It is clear that the Act was originally adopted for the purpose of promoting thrift among the members and giving them a source of installment credit which their economic status would not otherwise afford. Likewise, it is clear that this type of thrift opportunity and credit was to be available only to those who were members of a particular federal credit union.

Furthermore, the Congressional Record at the time Section 1759 was amended indicates that the purpose of the amendment was to

"permit joint-ownership status, *such as is generally permissible for bank deposits, building-and-loan shares, and similar investments,* with any person who may be designated by the credit-union member. Since the proposed provision would deny to the joint tenant, unless he himself is a qualified member, the ordinary rights of a shareholder to obtain loans, to vote, or to hold office, it would not increase the member's rights nor adversely affect the rights of other members of the credit union." (Emphasis supplied.)

1946 U.S. Code Congressional Service, Senate Report No. 1647 at 1323.

It would thus appear that Congress was not thinking in terms of superseding settled state law with reference to joint tenancies but, rather, in putting the various federal credit unions on a status equivalent to that of other competing financial institutions.

This conclusion is likewise rational in view of the provision in the Act which allows a state credit union by a very simple procedure to become a federal credit union and, conversely, allows a federal credit union to be converted into a state credit union under the particular laws of any state. 12 U.S.C.A. § 1771. It would be inconceivable that Congress would have intended to create a special type of joint tenancy and at the same time freely permit the conversion of a federal credit union to a state

credit union where such a joint tenancy contravenes the laws of that state. Congress clearly indicated its intent by the enactment on October 19, 1970, of 12 U.S.C. A. § 1790 which states:

"It is not the purpose of this subchapter to discriminate in any manner against State-chartered credit unions and in favor of Federal credit unions, but it is the purpose of this subchapter to provide all credit unions with the same opportunity to obtain and enjoy the benefits of this subchapter."

This result is supported by the rationale found in two decisions of the United States Supreme Court dealing with congressional intent in the matter of branch banking. In First Nat. Bank of Logan v. Walker Bank & T. Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), the McFadden Act of 1927, as amended, 12 U.S. C.A. § 36(c)(1)(2), was construed. This act facially would appear to give somewhat blanket authority for branch banking in the federal system. A unanimous Court interpreted the intent of Congress not as an attempt to override state law, but only to place banks within the federal system in a position of "competitive equality" with banks operating by virtue of state charter. This doctrine was reaffirmed in First National Bank in Plant City, Florida v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L. Ed.2d 312 (1969), in which Mr. Chief Justice Burger, speaking for a majority of the Court, held:

"The policy of competitive equality is . . . firmly embedded in the statutes governing the national banking system."

*Id.,* 396 U.S. at 133, 90 S.Ct. at 343.

 We thus conclude that the amendment to Section 1759 in 1946 was not intended to create a type of joint tenancy which would contravene state law but only to place the various federal credit unions in a position of competitive equality

with other banking institutions serving the same geographical areas.[3]

The entry is

Appeal sustained. The case is remanded to the Superior Court for entry of a judgment for the plaintiff in accordance with the stipulation, namely: Judgment in the amount of $7,151.06 plus interest from May 9, 1972.

WEBBER, J., sat at argument but retired before this opinion was rendered.

All Justices concurring.

---

3. Because we have held that Congress did not intend to supersede the state law on joint tenancies by the enactment of Section 1759 of the Federal Credit Union Act, we find it unnecessary to consider whether, had it so intended, it would violate the Tenth Amendment to the United States Constitution which reserved to the states:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Had this issue been one appropriate for decision in this case, we would be mindful of the analogy found in the decisions of several jurisdictions and recognized by the Supreme Court which hold generally that the rules of descent and distribution of property are subjects belonging exclusively to the jurisdiction of the states. *See* In Re Estate of McBride, 110 Ill.App.2d 200, 249 N.E.2d 266 (1969); Bragdon, Trustee v. Worthley, 155 Me. 284, 153 A.2d 627 (1959); Riggs v. Del Drago, 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106 (1942); Petition of Worcester County Nat. Bank, 263 Mass. 444, 162 N.E. 217 (1928); People v. Brady, 271 Ill. 100, 110 N.E. 864 (1915).