**STATE OF COLORADO ex rel. STATE BANKING BOARD, and Harry Bloom, State Bank Commissioner and Chairman, State Banking Board, Plaintiffs,**

v.

**FIRST NATIONAL BANK OF FORT COLLINS, and James E. Smith, Comptroller of the Currency of the United States, Defendants.**

**Civ. A. No. 75–M–397.**

United States District Court, D. Colorado.

May 28, 1975.

---

J. D. MacFarlane, Atty. Gen., Jean E. Dubofsky, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen., Tennyson W. Grebenar, and Ruthanne Gartland, Asst. Attys. Gen., Denver, Colo., for plaintiffs.

Ward H. Fischer, William H. Brown and Ronald W. Rutz, Fort Collins, Colo., for defendant First National Bank, Fort Collins Colorado.

James L. Treece, U. S. Atty., and Douglas D. Doane, Asst. U. S. Atty., Denver, Colo., Irving Jaffe, Acting Asst. Atty. Gen., Harland F. Leathers and David C. Shonka, Attys., Dept. of Justice, Washington, D. C., and C. Westbrook Murphy, Deputy Chief Counsel, Comptroller of the Currency, Washington, D. C., for defendant James E. Smith, Comptroller of the Currency of the United States.

## MEMORANDUM OPINION AND ORDER

MATSCH, Judge.

This is an action by the State of Colorado on the relation of its State Banking Board and State Bank Commissioner for a declaratory judgment and permanent injunction. Plaintiff claims that defendant First National Bank, Fort Collins, is conducting branch banking operations contrary to both Federal and Colorado law at its 3000 South College location, and the defendant Comptroller's interpretive ruling, which authorizes this activity, is invalid. A motion for preliminary injunction was heard on April 30 and May 1, 1975. All parties were represented at that hearing and evidence was received. At the conclusion of the hearing counsel agreed that there would be no other evidence at a trial on the merits except for the possible offer by the Comptroller of some additional evidence concerning existing practices of state banks in Colorado. With that reservation the case is ready for determination on the merits.

### THE FACTS

First National Bank, Fort Collins, Colorado ("BANK") is a national bank located at 205 West Oak Street in the downtown business district of Fort Collins, Colorado. On December 12, 1974, the Comptroller of the Currency issued an interpretive ruling, 12 C.F.R. 7.7491, Customer-Bank Communication Terminals (39 F.R. 44416, Dec. 24, 1974). Pursuant to that ruling and after giving the notice required by it, the BANK has installed a customer service machine in addition to two previously installed machines. One of these is located in the main bank building on Oak Street. Another is on Laurel Street, within 3000 feet of the main bank building and within the requirements of a permitted "detached facility" under Colorado law. The machine which is the subject of this suit is located in a shopping center development at 3000 South College Avenue, approximately 2.8 miles from the main bank building on Oak Street.

All three of these machines are operated under the registered trade name "First 24 Hour Bank". The College Avenue machine is located in the exterior wall of a brick office building and is designed as a drive-through facility to be operated by a person seated in an automobile.

This machine is manufactured by Docutel Corporation. The machine is not connected with the computer center at the BANK's main office building and the machine operates electrically as a self-contained unit, unmanned by any personnel.

The machine can be operated only by those bank customers who have cards which have been encoded with certain information on a magnetic stripe. The cards used may be either a "Master Charge" Card or a "First 24 Card" issued by the BANK. The encoded information consists of a six digit personal identification number, the customer's checking account or savings account number, his "Master Charge" number, the number of withdrawals permitted to him each day and the expiration date of the card.

To operate the machine the customer inserts his card into a slot on the unit and taps out his personal identification

number. The machine makes the identification from the previously encoded information and signals the customer to select one of the available transactions. If identification is not made the card is retained in the machine and no transaction can be accomplished.

The customer can obtain a prepackaged packet of either $25.00 or $50.00 in currency out of the machine. That money may be withdrawn from either a savings account or a checking account. It may be charged to a "Master Charge" account or to a "Balance Plus" account, the latter being a name given to a prearranged line of credit as an adjunct to the customer's checking account with the BANK.

The fact that a withdrawal has been made or that an advance of funds has been made against the line of credit or the "Master Charge" account is recorded by the machine which also records that use on the customer's card, thereby controlling the frequency of withdrawals.

The customer may deposit funds in the form of checks or currency by placing those items in an envelope and inserting it into a slot in the face of the machine, tapping out the amount on numbered keys and pressing a button to indicate whether the deposit is to be credited to a checking or savings account. The deposit is recorded by the machine.

The customer may also transfer credit from a savings account into his checking account or vice versa by pressing the appropriate buttons. Again the transaction is recorded by the machine.

The machine contains pre-printed transaction forms on which the machine prints coded information identifying the machine number, the customer's account number, the type of transaction, the amount of the transaction, the time of day of the transaction, a sequence number and other data. The machine issues a copy of this transaction form to the customer and another copy is retained within the machine.

At the beginning of each banking day, two persons open the unit, replenish the cash supply, collect the transaction forms and pick up the envelopes containing the checks or currency deposited. The transaction forms and deposit envelopes are then taken to the main office of the BANK at 205 West Oak Street for verification and processing into computer readable characters for forwarding to the computer center. There the transactions are posted to the appropriate accounts. Accordingly, the transactions occurring on a given day are not entered into the customer account records of the BANK until the following day. The transaction forms used all bear the printed inscription "all transactions are subject to proof and verification."

At the time of the hearing this machine on College Avenue was the only such machine being used by a state or national bank in Colorado at a location other than the main bank building or within the 3000 foot radius authorized for a single detached facility under Colorado law.[1] There are several such machines currently operated by savings and loan associations in Colorado. These machines have received favorable acceptance from the bank's customers.

It is a common practice for both state and national banks in Colorado to receive deposits from customers by mail, using envelopes and transaction forms provided by the banks for that purpose. It is also common for commercial customers of Colorado banks to transfer funds between accounts in different banks through communications by wire or telephone. These transfers may be accomplished by crediting the correspondent balance of the receiving bank and debiting the correspondent balance of the transferring bank without any other documentation. Another common practice for banks in this state is the

1. There are two banks which permit reciprocal use of their respective machines by each others' customers.

extension of a line of credit to a commercial customer who signs a master note for the full amount to be borrowed, but who then controls the credit costs by requesting the actual advance of funds to be made by credits to his checking account as needed. Those requests are frequently made by telephone on a daily basis.

## THE LAW

Title 12 U.S.C. § 36(c), in relevant parts, provides as follows:

A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

. . .

Title 12 U.S.C. § 36(f) provides:

The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

The State of Colorado prohibits branch banking by statute. C.R.S. 1973 § 11–6–101(1) provides:

Every bank shall be conducted at a single place of business, and no branch thereof shall be maintained elsewhere; but any bank, upon application to and approval by the banking board, may operate one detached facility, only if the detached facility is located within three thousand feet of the nearest point on the boundary of the premises of the bank's place of business and is not located within three hundred feet of the boundary of the premises of another bank or another bank's detached facility, unless the other bank consents to a closer location. The board shall give written notice of every application to each bank located within a three-mile radius of the applicant bank and may, in its discretion, order a public hearing with respect thereto. Approval shall be granted by the board only upon a showing of need. Banking activities at such detached facility shall be restricted to receiving deposits, issuing money orders, cashiers' checks, and travelers' checks or similar instruments, cashing checks or drafts, making change, receiving note payments, receiving or delivering cash and instruments and securities, and disbursing loan proceeds by machine. Any other facility, agency, or paying or receiving station operated by any bank or agent shall constitute a branch within the meaning of this section. Any facility authorized by the United States treasury department shall not be subject to the limitations of this section.

In deciding First National Bank of Logan v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), the Supreme Court reviewed the legislative history of Section 36 and concluded:

. . . that Congress intended to place national and state banks on a basis of "competitive equality" insofar as branch banking was concerned. (p. 261, 87 S.Ct. p. 497)

In First National Bank in Plant City v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) the Supreme Court determined that the definition of branch banking in § 36(f) included an armored car messenger service and an

984

off-premises receptacle for packages containing cash or checks for deposit. With respect to the depository the Court rejected the argument that the deposits could not be considered to be made until they had been taken to the bank and verified by saying:

> . . . Unquestionably, a competitive advantage accrues to a bank that provides the service of receiving money for deposit at a place away from its main office; the convenience to the customer is unrelated to whether the relationship of debtor and creditor is established at the moment of receipt or somewhat later. (p. 137, 90 S.Ct. p. 345)

## CONCLUSIONS

■ Jurisdiction over this controversy is found in 28 U.S.C. § 1331 and 5 U.S.C. § 702.

■ The interest of state administrative officials in enforcing branch banking prohibitions to maintain competitive equality between state and national banks has been held sufficient to confer standing to challenge the actions of the Comptroller of the Currency. Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694 (1967); Jackson v. First National Bank of Valdosta, 349 F.2d 71 (5th Cir. 1965). Since those decisions the Supreme Court of the United States has determined that standing to review agency action does not require a showing of substantial injury and that a question of principle may be litigated. United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The plaintiffs therefore do have standing to seek a declaratory judgment in this civil action.

■ The Comptroller has contended that the plaintiffs failed to exhaust administrative remedies because they did not participate in the administrative process leading to the questioned interpretive ruling. There is no merit in that argument because that ruling was issued without a hearing. While a later hearing was held in April, 1975, the original ruling of December 12, 1974 is the final agency action subject to judicial review under 5 U.S.C. § 704. Moreover, the transcript of the April 2, 1975 hearing shows that an officer of a national bank in Colorado did appear and did present testimony concerning the installation of the machine in Fort Collins. (Transcript of proceedings, April 3, 1975, pp. 434–436).

■ The first question to be answered in this case is whether the machine installed in the wall of the building at 3000 South College Avenue is a place at which deposits are received. Because I can see no functional difference between the way in which a customer makes a deposit in this machine and the stationary receptacle for deposits which was the subject of the decision in First National Bank in Plant City v. Dickinson, *supra,* I am compelled to conclude that it is such a place. Accordingly, to the extent that it performs the function of receiving deposits, this machine constitutes a branch bank under Title 12 U.S.C. § 36(f). Because the BANK already has a detached facility, and because this machine is beyond the geographical limit of a permitted detached facility, the machine is not authorized by Colorado law. Therefore, to the extent of this single function the machine is prohibited branch banking. The transfer of funds between accounts of the bank customer is not a deposit.

■ The next question is whether this machine is a place at which checks are paid. I conclude that it is not. The word "check" is defined in Webster's Third New International Dictionary, Unabridged, 1968, as "A written order directing a bank or banker to pay money as therein stated . . . ." The definition given to "check" in the Uniform Commercial Code is ". . . a draft

drawn on a bank and payable on demand". C.R.S.1973 § 4–3–104(2).

There is an obvious similarity between the customer's use of this machine to obtain a packet of $25.00 with a corresponding debit to his checking account balance and the drawing of a check payable to cash or to himself with the presentation of that check for payment by the drawee bank at a teller station. This sameness in result, however, is not controlling. What is different in the transaction is the means by which the customer communicates with the bank. To instruct the bank by depressing the keys on this Docutel machine is not the writing of an order for the bank to pay upon demand. It is comparable to the wire transfer of funds by commercial customers, and that is not considered to be the payment of a check.

The third question is whether the subject machine is a place at which there is "money lent". I conclude that it is not. Whether the customer obtains the prepackaged currency as a charge against his "Master Charge" account or his "Balance Plus" account, he is drawing against a prearranged line of credit. There is no apparent functional difference between this use of a bank credit card and the use of such a card to obtain cash, services, or products from a retail trader who accepts such cards. To conclude that this function of the machine is branch banking would therefore require the conclusion that any such use of bank credit cards is also branch banking.

In the statement of explanation accompanying his interpretive ruling, the Comptroller set forth clearly and cogently his reasons for believing that approval of the operation of customer-bank communication terminals by national banks is sound public policy. It is not the proper function of this Court to decide whether it is good or bad policy to permit the use of these machines by banks.

This Court shares the Comptroller's observation that it is a difficult task to apply the language of a 1927 statute to the use of an electronic technology never envisioned by those who wrote the law.

In reaching these conclusions I have followed the direction of the Supreme Court of the United States, in the cases cited above, to consider the McFadden Act by applying the literal meaning of its language to the functions of this machine. The Comptroller of the Currency has no authority to do otherwise. Accordingly, to the extent that his interpretive ruling permits the use of this machine to receive deposits, it is erroneous and the permission given to the defendant BANK to make that use of the machine is invalid.

During the presentation of arguments in this case, counsel for the BANK assured this Court that a declaratory judgment would be followed by the BANK without any necessity for an injunction. Accordingly, there is no need to determine whether the evidence would support a finding of immediate and irreparable injury. Additionally, because the use of this machine to receive deposits has not been expressly authorized for state banks by the State of Colorado, it would be irrelevant and immaterial to receive any additional evidence on the question of banking practices in Colorado as suggested by the Comptroller. There is, therefore, no need for any further hearing in this case.

Upon the foregoing, it is

Ordered and adjudged that the use of the bank machine at 3000 South College Avenue, in Fort Collins, Colorado, by the First National Bank for the receipt of deposits is branch banking in violation of Title 12, U.S.C. § 36(f) and that to the extent such use is permitted by the interpretive ruling of the defendant Comptroller of the Currency, that ruling is invalid. The other functions of this machine do not constitute branch banking and the permission given by the Comptroller pursuant to his interpretive ruling for those functions is valid.