REQUESTED BY: Cynthia Milligan, Director of Department of Banking and Finance
QUESTION:
 Does a state chartered bank violate Nebraska branch banking laws when it has an insurance company not only act as a loan production office (LPO), but also handle bank notes and bank drafts of proceeds from that note?
CONCLUSION:
Yes.
 For purposes of this opinion, the following facts have been assumed. An insurance company (Insurance Company) has agreed to assist in processing automobile loans for a state chartered bank (Bank) at locations throughout eastern Nebraska and western Iowa. Contact with the insurance agent (Agent) by the customer is at either the agent's office or the customer's home.
The Agent assists the customer in completing a loan application. Agent then transmits the information on the loan application to Bank by telephone. Bank does a credit check and either denies or approves the loan and advises the Agent who then tells the customer. Bank calculates remaining information for the note and conveys this information to Agent by telephone. Agent then completes the note which borrower signs at a location other than the main bank or a branch bank office. Agent completes notice to cosigner and one or two bank drafts which borrower then signs. Agent mails draft copies and original note to Bank. Drafts are given to named payees, who then return drafts through the normal check collection process. The payee is provided a preaddressed envelope to forward title of vehicle to Bank, as well as any other relevant documents. Insurance Company is compensated by Bank.
The establishment and practices of banking in the State of Nebraska are regulated by acts of the State Legislature which have been codified in Neb.Rev.Stat. § 8-101 et seq. (Reissue 1987, Cum. Supp. 1988, Supp. 1989). Nebraska law provides:
a bank shall be construed to mean any such banking institution as shall be, in addition to the exercise of other powers, following the practice of repaying deposits upon check, draft or order and of making loans.
Neb.Rev.Stat. § 8-101(4) (1988 Cum. Supp.). The Department of Banking and Finance has interpreted this section of Nebraska law to give to state chartered banks, in addition to what one would consider the normal banking powers of making and servicing loans and receiving deposits, the power to provide all banking services and products of a full financial intermediary and all related incidental powers. (Nebraska Department of Banking Finance Statement of Policy #9, 1983).
State law also provides that "[n]o bank shall maintain any branch bank; and except as provided in subsection (2) to (7) of this section and § 8-122.01, the general business of every bank shall be transacted at the place of business specified in its charter." Neb.Rev.Stat. 58-157(1) (LB956, 1990). It is apparent by the wording of this statute that the legislature was deliberate in limiting the number of locations from which banking institutions could transact business. However, some limited exceptions to this rule are specified within the statutes. With the director's approval, banking institutions may "(a) Maintain an attached auxiliary office if such office is physically connected . . . [to the main office and] (b) may [also] establish and maintain not more than five detached auxiliary offices at which all banking transactions allowed by law may be made." Neb.Rev.Stat. 58-157(2).
These statutes have been further interpreted by the Department of Banking and Finance by issuance of Statements of Policy. While not carrying the same weight and controlling authority as a state statute or a regulation, they are official interpretations of a controlling state law by the agency charged with making such interpretations. The Nebraska Supreme Court has held that:
although construction of a statute by a department charged with enforcing it is not controlling, considerable weight will be given to such construction, particularly when the Legislature has failed to take any action to change such an interpretation.
McCaul v. American Savings Cq.., 213 Neb. 841, 846, 331 N.W.2d 795,798 (1983). The statutes regulating banking were most recently revised in 1990, and no substantive changes relating to this issue were made in those sections governing branch banking. In 1988, the Supreme Court affirmed its earlier holding in Maul saying that "[t]here is a general rule of statutory construction that the interpretation of a statute given by an administrative agency to which the statute is directed is entitled to weight." Vulcraft v. Karnes, 229 Neb. 676, 678, 428 N.W.2d 505, 507
(1988). The Supreme Court holdings thus provide that the Statements of Policy ought to be accorded some weight when interpreting the meaning of Neb.Rev.Stat. §§ 8-101 § 157.
Only the main bank and specifically authorized branch banks are permitted to conduct or facilitate banking transactions, particularly the taking of deposits or the making of loans. (Statement of Policy #28, 1989). The location other than the main office or an authorized branch bank at which loans are originated is referred to as a Loan Production Office (LPO). Activities which constitute a loan origination are described by the Department of Banking and Finance as:
solicitation of loan business, providing information as to loan rates and terms, interviewing and counseling applicants regarding loans, aiding customers in completion of loan or deposit applications, making credit checks, and receiving and reviewing loan applications.
(Statement of Policy #9). The Department concludes by saying that no other types of bank activities may be performed at the LPO. The Department listed by example the following activities as specifically not allowable at a LPO: possession or carrying of bank notes, deposit agreements, signature agreements, dispersement of note proceeds or accepting of deposits.
The office operating in the present fact situation is among other things handling the Bank's note. The office is taking information from Bank and completing the note and federally required disclosure documents and then obtaining the borrower's signature as well as that of the cosigner on the Notice to Cosigner. The office then completes the necessary bank drafts which borrower then signs and forwards to the designated payee. The office mails the draft copies, the original note and application to the Bank.
The office is, contrary to specific restrictions in the Department's Policy Statement #9, possessing and carrying bank notes, deposit agreements, and signature agreements and dispersing note proceeds through the handling of the drafts. The policy statement not only should be accorded deference regarding the interpretation of state law but appears to be a reasonable means of differentiating between LPO's and branch banks. Therefore, even if the policy statement did not exist, these actions appear to be contrary to the provisions of Neb.Rev.Stat. §8-101(4) and 8-157.
On May 22, 1958, the office of the Attorney General issued an opinion which in substance concluded that given a fact pattern similar to the presumed facts of this opinion, the insurance company was not in violation of the state prohibition against branch banking. (Attorney General Opinion, May 22, 1958). Since 1958, the laws concerning branch banking have undergone many changes. Principally, the U.S. Supreme Court in First National Bank v. Dickinson, 396 U.S. 122, 24 L.Ed.2d 312,90 S.Ct. 337 (1969) upheld the determination by the Comptroller of the State of Florida of what constituted branch banking. This holding, while not directly on point, gives some indication that the Supreme Court has been willing to hold that branch banking exists even when only a minimum of banking activities occur. Thus on the national level branch banking has been carefully controlled. Additionally, since 1958 the Statements of Policy have been issued and revised by the Department of Banking, thereby attempting on the state level to carefully control, among other activities, branch banking.
An insurance company and its agents are legitimately eligible to act as a Loan Production Office (LPO). The specific activities permitted have been articulated by the Department. There is a clear distinction between the activities construed as "loan processing" and those which cross the line into activities reserved for banks. The handling of the bank note and the bank drafts from the proceeds of the note, cross this line.
Therefore, the previous opinion by the Attorney General's office is superceded by this opinion.
Respectfully submitted,
 ROBERT M. SPIRE Attorney General