STATE OF ILLINOIS ex rel. Richard K. LIGNOUL, Commissioner of Banks and Trust Companies, State of Illinois, Plaintiff,

v.

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant.

STATE OF ILLINOIS ex rel. Richard K. LIGNOUL, Commissioner of Banks and Trust Companies, State of Illinois, Plaintiff,

v.

The FIRST NATIONAL BANK OF CHICAGO, Defendant.

Nos. 75 C 2027, 75 C 3144.

United States District Court, N. D. Illinois, E. D.

Dec. 29, 1975.

William J. Scott, Atty. Gen., Jerome J. Webb, Asst. Atty. Gen., Chicago, Ill., for plaintiffs.

Ray H. Greenblatt, Wayne W. Whalen, Douglas A. Poe, Mayer, Brown & Platt, Chicago, Ill., Donald J. Yellon, William B. Davenport, Perry Moore, James L. Foorman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

WILL, District Judge.

This opinion disposes of cross motions for summary judgment filed by Continental Illinois National Bank (Continental) and First National Bank (First National) as well as the State's Commissioner of Banks and Trust Companies in related cases brought by the Commissioner. The state seeks declaratory and injunctive relief with respect to the defendant's use of Customer Bank Communication Terminals (CBCTs). Specifically, the issue is whether or not CBCTs are "branches" under the McFadden Act, 12 U.S.C. § 36, and subject to the Act's proscriptions regarding branch banking.

### I. THE FACTS

The parties have entered into stipulations of uncontested facts which we adopt and incorporate by reference herein. In substance, they are as follows.

Continental currently operates two unmanned CBCTs located at 2 Illinois Center and in the Chicago North Western Railroad Station. These terminals are on-line machines connected directly to one of Continental's main office computers. Communication between CBCTs and the main office computer is by telephone lines which carry electrical impulses back and forth approximately one per second. The lines are leased from the Illinois Bell Telephone Company.

At both CBCTs, Continental customers and depositors, using their Continental Banking cards, are allowed to:

a) withdraw cash (in the amount of $25.00 or any multiple thereof, up to $100.00) from their savings, checking or credit card accounts;

b) deposit checks or currency in a checking or savings account. At the time of the transaction, the customer is given a receipt at the CBCT indicating the amount and date of the deposit; it is not credited to his account and he may not draw on it until it is received and verified at the main banking premises;

c) transfer funds between accounts: checking to savings, credit card to checking, or savings to checking; and

d) make payments on Continental Bank installment loans or credit card charges.

For all of the foregoing functions, the procedure for operating the terminals is essentially the same. First, the customer inserts his Continental Banking Card into the CBCT, thus activating the Terminal. This card contains an electronic funds transfer system (EFTS) access number. The CBCT scans the card's magnetic tape. If the card is damaged, it will be returned to the customer. If it has expired, it will be "captured", i. e., retained by the machine. If the card is neither returned nor captured, the CBCT will instruct the customer to build a "message" to be sent to Continental's main computer. The customer has 90 seconds to enter the first item in the "message", his Personal Identification Number (PIN), a randomly generated number used to verify that the customer addressing the CBCT is the proper user of the card. If he fails to enter his PIN within 90 seconds, the card will be captured.

After entering his PIN on the amount keyboard (the amount window remains dark during this time), the customer is instructed to select the type and amount of the transaction he desires to effect, first, by pressing a key on the transaction keyboard and then by entering the total dollar and cents amount on the amount keyboard. This amount will be displayed in the amount window.

If the customer requests cash in an amount that cannot be dispensed by the machine, which is supplied only with packets of $25.00, the card will be returned and the customer will be asked to begin again. If the amount is one that the machine can dispense, and the customer sees that it is stated correctly in the amount window, he presses the "enter" key. If the amount or type of transaction shown in the window is incorrect, the customer presses the "clear" key and begins again.

When the "enter" key is depressed, the CBCT sends a message over the telephone wires to the Bank's main computer. This message contains the customer's EFTS access number, his PIN, and the transaction request he has entered. The main computer which receives this information is an IBM 370 containing several files kept on "disc" (a type of storage medium for data). These include customer authorization files, indexed by EFTS access number; a file of PINs, carried in a scrambled pattern to prevent unauthorized access or accidental discovery; a transaction log file to record the day's work; and a maintenance history file.

When the message is received, the main computer checks first to be sure that there is an EFTS master record that matches the access number sent by the CBCT. If there is no such record, the card is assumed to have been issued by another bank and the computer will instruct the CBCT to return it to the customer. If the EFTS Master Record is located, then the PIN in the request is matched to the scrambled number in the PIN master file. If they do not correspond, a message will be sent back to the CBCT asking the customer to try again. If, after two more attempts, the customer still has not entered the correct PIN, the main computer will instruct the CBCT to capture the card which it will do.

If the PIN entered by the customer is correct, the main computer will then check to make sure that the customer has not exceeded the daily withdrawal limit or the maximum limit on overall use of his card. If he has exceeded these limits, the CBCT will be instructed to return the card. If the customer is within the proper limits, the main com-

puter will go on to check the validity of the transaction requested. It will verify first that the necessary accounts actually exist and, if so, are not restricted. If this information is in order, the main computer will check the "capture code" to determine whether the card has been revoked or suspended in which case the CBCT will be instructed to capture the card. If the card is not listed in the "capture code", the main computer will send an authorization reply to the CBCT Terminal.

The CBCT will respond to this reply by continuing with the next step in the transaction. In the case of a deposit or payment transaction, a drawer will open and the customer will be asked to place in the machine an envelope containing his payment or the items to be deposited. Once it is in the machine, the envelope is stamped with a receipt number in the sequence of the day's business. A receipt carrying the location and the number of the CBCT, the expiration date of the card, the type of transaction, the date and time, the Bank's own identification number, the customer's account number, the type of transaction (for a second time), the amount, and the statement that "All transactions are subject to proof and verification" is printed in duplicate at the same time. One copy is dispensed to the customer and one is retained in the machine. When the receipt is dispensed, the CBCT sends back to the main computer a completion status message (CSM). On receipt of the CSM, the main computer will record the transaction on its EFTS master record for the transaction just completed.

After being authorized by the main computer, the other types of transactions proceed in a similar manner. When the customer has requested cash, he will receive the appropriate number of $25.00 packets and a receipt with the information set out above. When the customer has requested a transfer of funds between accounts or has authorized payments out of his accounts, he will receive only the appropriate receipt.

Continental also plans to open CBCTs at 62 Chicago Area Dominick's Stores. These terminals will be used for the same kinds of transactions referred to earlier as well as for payment of goods and services purchased by the customer at Dominick's. The only significant difference in the procedure is that a Dominick's employee will operate the machine for the customer.

Defendant First National is presently operating 5 CBCTs at four locations in the City: Rush-Presbyterian St. Luke's Medical Center, Avon Products, Baxter Laboratories, and the Time-Life Building. These were installed as part of First National's "bank at work" program and for a short period, from August 25 to September 23, 1975, the bank's personnel were soliciting and opening new accounts among employees at the CBCT locations. As of November 1, 1975, First National's CBCTs were to be operated "on-line" and unmanned. First National's CBCTs perform the same functions and are operated in essentially the same manner as those of Continental.

Both banks opened the CBCTs following an interpretive ruling of the United States Comptroller of the Currency (Ruling of December 12, 1974 as modified May 8, 1975) wherein he held that the terminals were not "offices within the meaning of 12 U.S.C. § 36(f) and even if a CBCT is considered to be a branch office, branch agency, or branch place of business, it is not receiving deposits, paying checks, or making loans within the meaning of 12 U.S.C. § 36(f)." In their motions, defendants argue that, as a matter of law, the CBCTs are not branches within the meaning of the Act.

## II. THE LAW

Title 12 U.S.C. § 36(c) allows national banking associations with the approval of the Comptroller of the Currency (Comptroller) to operate new branches when, where and how state law would allow state banks to operate such branches. *First National Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966).

Section 36(f) defines the term branch as follows:

> (f) The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

The leading case construing 12 U.S.C. § 36(f) is *First National Bank in Plant City v. Dickenson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). In that case, the Court was called upon to determine whether an armored car messenger service or an off-premises receptacle for the receipt of packages containing cash or checks for deposit constituted a branch within the meaning of the Act. The First National Bank in Plant City, Florida (Plant City First National) had received permission from the Comptroller to operate these two services. The armored car messenger service was advertised by the bank as a mobile drive-in. Checks could be cashed, deposits taken, and, through a "dual control contract," commercial customers could arrange for the car to bring them cash and pick up deposits at their places of business. The armored car was manned by a teller and a driver-guard. Pursuant to contracts between the customers using the service and the bank, deposits were not deemed to be made until the cash or checks were delivered to a teller at the banking house. Conversely, checks were deemed to be cashed when cash was handed to the messenger and not when delivered to the customer by the armored car.

The stationary off-premises receptacle for receipt of deposits was located in a shopping center one mile from Plant City First National's banking house in a space leased by the bank. The facility consisted of a secured receptacle and night base, together with a writing table supplied with envelopes and transmittal slips. As with the armored car, the messenger who collected the funds from the receptacle was deemed to be an agent of the customer, the funds were not deemed to be deposited until delivered at the bank's premises, and the bank provided insurance for the funds. Since the state of Florida prohibited state banks from having more than one place of business or from transacting business at more than one place, the Court was confronted with whether the activities of Plant City First National, authorized by the Comptroller, constituted branch banking.

After an extensive analysis of the history and underlying policy of the National Bank Act's branching provisions as well as the federally defined elements of branching, the Supreme Court concluded that the services offered by Plant City First National were branches as defined in Section 36(f) and an attempt to secure for national banks branching privileges which were denied to competing state banks.

As was noted by the Supreme Court in *Walker Bank, supra*, and reiterated in *Plant City*, the passage in 1927 of the McFadden Act, which afforded branching privileges to national banks only to the extent of state authorized state branch banking, was in response to a trend observable during the first quarter of the twentieth century. During that period the substantial growth in some states of state banks with branches threatened to impair and possibly eventually destroy the national banking system.[1] The McFadden Act was designed to establish "competitive equality" between state and national banks with re-

---

1. There was no specific authority in the National Bank Act of 1863 for branching by National Banks. *First National Bank in St. Louis v. Missouri*, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1923). Consequently, at the turn of the century there were very few branch banks in the country. Only five national banks and 82 state banks were operating branches with a total of 119. By the end of 1923, there were 91 national banks and 580 state banks operating a total of 2,054 branches. *First National Bank v. Walker Bank*, 385 U.S. 252, 257, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966).

spect to branching, the question of the desirability of branch banking to be left up to each state. As pointed out in *Walker Bank, supra,* this policy of "competitive equality" survived an attempt during the economic depression to permit national banks to branch irrespective of state law. Accordingly, the Supreme Court in *Plant City* concluded:

> The policy of competitive equality is therefore firmly embedded in the statutes governing the national banking system. The mechanism of referring to state law is simply one designed to implement that congressional intent and build into the federal statute a self-executing provision to accommodate to changes in state regulation. 396 U.S. at 133, 90 S.Ct. at 343.

The Supreme Court in *Plant City* also recognized that, while branching by national banks is permissible only to the extent permitted by state law, what constitutes branching is defined by Federal law. The following language is illustrative of its position:

> We reject the contention made by *amicus curiae* National Association of Supervisors of State Banks to the effect that state law definitions of what constitutes "branch banking" must control the content of the federal definition of § 36(f). [footnote omitted] Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated, *Walker Bank, supra,* for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. But to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Congress did not intend such an improbable result, as appears from the inclusion in § 36 of a general definition of "branch." On this point the language of the Court of Appeals perhaps overstated the relation of state law to the problem, since the threshold question is to be determined as a matter of federal law, having in mind the congressional intent that so far as branch

banking is concerned "the two ideas shall compete on equal terms and only where the States [allow] their own institutions [to] have branches." In short, the definition of "branch" in § 36(f) must not be given a restrictive meaning which would frustrate the congressional intent this Court found to be plain in *Walker Bank, supra.* 396 U.S. at 133–134, 90 S.Ct. at 343. Referring to the § 36(f) definition of branching, the Court concluded:

> Although the definition may not be a model of precision, in part due to its circular aspect, it defines the minimum content of the term "branch"; by use of the word "include" the definition suggests a calculated indefiniteness with respect to the outer limits of the term. However, the term "branch bank" at the very least includes *any* place for receiving deposits or paying checks or lending money apart from the chartered premises; it may include more. It should be emphasized that, since § 36(f) is phrased in the disjunctive, the offering of any one of the three services mentioned in that definition will provide the basis for finding that "branch" banking is taking place. Thus not only the taking of deposits but also the paying of checks or the lending of money could equally well provide the basis for such a finding. 396 U.S. at 135, 90 S.Ct. at 344.

The Supreme Court has, therefore, definitively interpreted the McFadden Act with respect to the definition of branching and the underlying policy of the branching provisions.

### A. The Comptroller's Ruling

On December 11, 1974, the Comptroller issued an interpretive ruling (effective December 24, 1974) which held both as a matter of law and sound policy that CBCTs may be operated by national banks without regard to restrictions in the federal law regarding branching. This holding followed a comprehensive review of the branching statute's background and purposes.

The Comptroller initially held that CBCTs were not branch banks, branch

offices, branch agencies, additional offices, or branch places of business. He based this ruling on the impossibility of consummating at a CBCT certain banking transactions associated with a banking office or place of business. These included opening an account with the bank, applying for a loan, purchasing savings bonds, obtaining money orders, cashiers checks or travellers checks, cashing travellers checks, maintaining a safe deposit box, exchanging currency, and engaging in any of a large number of other common retail banking transactions. As additional support for this conclusion, the Comptroller, citing portions of the legislative history, determined that Congress at the time it passed the McFadden Act defined branches in relation to teller windows, which were understood in both functional and physical terms as large and separate facilities. He characterized CBCTs as more closely analogous to mail boxes or telephones through which a customer may communicate with the bank to accomplish certain routine transactions, or to certain routine activities which were approved as non-branching in Supreme Court decisions antedating the McFadden Act.[2]

Alternatively, the Comptroller held that, even if a CBCT could be considered a branch office, branch agency, or branch place of business, it does not receive deposits, pay checks or make loans within the meaning of 12 U.S.C. § 36(f). Continuing his analysis, the Comptroller held that deposits at unmanned terminals are not made until the cash or checks are received and verified at the bank, cash withdrawals are not made pursuant to the writing of a check but upon the presentation of a card, and cash withdrawals on the basis of a credit card or authorized overdraft are not loans because they are effectuated pursuant to a previously approved line of credit and are subject to verification. At the manned terminals, he concluded, the transfers between customer and store accounts are consummated at the bank and cash withdrawals are from the store rather than the bank. Finally the Comptroller distinguished the contractual arrangements for the operation and use of CBCTs from those governing deposits and withdrawals from the armored car messenger service and deposit receptacles in *Plant City, supra*, by holding that, with respect to the use of CBCTs, they have a significant purpose other than removal of the possibility that monies received will become deposits within the meaning of § 36(f).

In analysing the competitive impact of the use by national banks of CBCTs, the Comptroller placed considerable emphasis upon the use of these terminals by Savings and Loan Associations and Credit Unions pursuant to new regulations promulgated by the Federal Home Loan Bank Board, 30 F.R. 23991, and the Credit Union Administration, 39 F.R. 30107. The Comptroller maintained that the McFadden Act protects the health of the national banking industry from impairment resulting from the loss of customers to savings and loans and credit unions.[3]

---

**2.** In *First National Bank in St. Louis v. Missouri*, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1923), the Supreme Court endorsed a 1911 opinion of Attorney General Wickersham which held that a difference exists between the mere appointment of agents to receive and collect money and to forward it to the bank, and the establishment of branch banks at which a general banking business is carried on.

**3.** On May 19, 1975, the Comptroller modified his ruling following a hearing held on April 2 and 3, 1975, at which testimony was received from 35 witnesses. The hearing was held to reconsider 12 CFR § 7.7491, the ruling of De-

cember 12, 1974, pursuant to the suggestion of Senator McIntyre, now Chairman of the Subcommittee on Financial Institutions of the Senate Committee on Banking, Housing and Urban Affairs, that the Comptroller might have overlooked several policy considerations in announcing his ruling and that it would have been useful to have a hearing. A similar suggestion was made by the Independent Bankers Association of America in connection with a petition filed by the IBAA seeking a recission of the Comptroller's interpretation. Based on written statements submitted in response to his January 16, 1975 notice of proposed rulemaking and on facts that came to the Comp-

## B. *District Court Decisions*

Three United States District Courts have ruled on the validity of the Comptroller's interpretive ruling. *State of Colorado ex rel. Bloom v. First National Bank of Fort Collins*, 394 F.Supp. 979 (D.Colo.1975); *Independent Bankers Association of America v. Smith*, 402 F.Supp. 207 (D.D.C. Decided July 31, 1975); and *State of Missouri ex rel. Kostman v. First National Bank in St. Louis*, 405 F.Supp. 733 (E.D.Mo., decided 11/17/75).

In *Bloom*, the CBCT was located at a shopping center approximately 2.8 miles from the main bank building, was not connected with the computer center at the Bank's main office building but operated electrically as a self-contained unit off-line, and was unmanned by any personnel. It could be operated by bank customers who had cards which had been encoded with certain information on a magnetic strip. The information consisted of a six digit personal identification number, the customer's checking account or savings account number, his Master Charge number, the number of withdrawals permitted to him each day, and the expiration date. The cards used to activate the CBCT could be either Master Charge or a "First 24 Card." The customer initiated the transaction by inserting his card into a slot on the unit and tapping out his personal identification number. The machine would make the identification from the previously encoded information and signal the customer to select one of the available transactions. If the identification was not made, the card was retained in the machine and no transaction was accomplished. As with the terminals in the instant case, those in *Bloom* allowed withdrawals from checking or savings accounts, advances on Master Charge cards, deposits in the form of checks or currency, and transfers from savings to checking and vice versa. At the beginning of each day two persons opened the unit, replenished the cash supply, and transported to the main office the deposits and transaction forms used to identify the type and time of transaction. There the deposits and forms were verified, processed and forwarded to the computer center where the appropriate account was charged.[4] Colorado law prohibited branch banking with the exception of permitting one detached facility within a limited radius of the bank's premises.

Considering the Supreme Court's decisions in *Walker Bank* and *Plant City, supra*, the Court concluded that, similar to the receptacle in *Plant City*, the machine was a place at which deposits were received. Accordingly, the Court held that the machine was prohibited branch banking to the extent of this single function. The Court further held that 1) the transfer of funds between accounts was not a deposit; 2) because the machine would not cash a check, i. e., a written draft, the machine was not a place where checks were paid. The Court explained that, even though the result is the same, the method of communication is different, i. e., instead of a written order there is the depressing of a button. The latter process, the Court continued, is comparable to wire transfer

---

troller's attention through hearings held on March 14, 1975 before the Senate Subcommittee, the Comptroller found no reason to alter his legal conclusions. Several modifications were made, however, which reflected the experimental nature of the CBCTs and were designed to facilitate the combined development of CBCTs under appropriate monitoring. The modifications did not go to the substance of the December 12, 1974 ruling with the possible exception of a limitation requiring that no CBCT could be located more than 50 miles away from the bank's main office. The Comp-

troller suggested that he perceived no danger of the use of CBCTs to penetrate new markets. He suggested, however, that the limitation would be useful to allay the fears of market penetration expressed on behalf of small banks.

4. Colorado banks were accustomed to receiving deposits in the mail and extending lines of credit to commercial customers who signed master notes, and banks regularly made transfers between accounts in different banks.

of funds by commercial customers. Finally, the Court held that the machine is not a place where money is lent because, whether the customer obtains prepackaged currency against "Master Charge" or "Balance Plus" (an overdraft of a checking or savings account), he is drawing against a prearranged line of credit. The Court stated that there is no functional difference between using credit cards to obtain cash and using them to obtain services or products.

Since there was no showing of express authorization for state banks to use the machine to receive deposits, the Court refused as irrelevant additional evidence on the question of banking practices in Colorado. It held simply that, so long as the machine accepted deposits, it was a prohibited branch.

In *Smith, supra*, the Court held that the Comptroller's holding that CBCTs were neither branch offices, banks, agencies, or additional offices or branch places of business within the meaning of the Act and that they did not cash checks, take deposits, or make loans, violated the clear wording of the statute, its legislative history, significant case law and the facts. Quoting from the Supreme Court's decision in *Plant City* and the following language from Representative McFadden relating to Section 36(f), the Court held that the Comptroller's determination was without merit.

> Any place outside of or away from the main office where the bank carries on its business of receiving deposits, paying checks, lending money, or transacting any business carried on at the main office, is a branch. 68 Cong.Rec. 5816 (1927).

The Court held the Comptroller's ruling null and void in that it violated the National Bank Act.

In *Kostman, supra*, the Court held, without discussion, that machines performing the same functions as the CBCTs here in question constituted branch banking within the meaning of 12 U.S.C. § 36(f).

## III. ANALYSIS

The state of Illinois prohibits branching by state banks. Illinois Revised Statutes, Chapter 16½, § 106 provides:

> No bank shall establish or maintain more than one banking house, or receive deposits or pay checks at any other place than such banking house, and no bank shall establish or maintain in this or any other state of the United States any branch bank, nor shall it establish or maintain in this State any branch office or additional office or agency for the purpose of conducting any of its business.

Upon examination of the functions of CBCTs, we conclude that certain of their operations constitute branching within the meaning of 12 U.S.C. § 36(f) and are, therefore, proscribed by § 36(c).

Relying upon the Comptroller's analysis, the banks argue that the functions performed at the CBCTs do not fall within the parameters of the federal definition, because, in actuality, deposits are made, checks paid, and money lent at the bank's main premises.

### A. *Deposits*

Defendants argue that because the customer is only given a receipt upon depositing checks or currency at the CBCT and because the customer's account is not credited and he is not able to draw on it until it is received and verified against records kept at the main banking premises, deposits actually take place at the bank's premises.

The Supreme Court in *Plant City* dealt with the question of whether a deposit should be determined to have been made upon the creation of the debtor-creditor relationship (receipt and verification) or upon the receipt of the deposit at a place away from the main banking office. Referring to the legislative purpose of competitive equality between state and national banks, the Court concluded that an advantage was certain to accrue to a bank which maintained a remote place

where deposits could be physically received. Accordingly, both the armored car and the deposit receptacle were held to be places for the receipt of deposits within the meaning of § 36(f), notwithstanding the contractual terms which provided that no deposit would be credited to the customer's account until physically delivered to the bank.

The Court's analysis in *Plant City* compels a similar conclusion with respect to CBCTs. Even though the customer's EFTS master record is updated immediately to reflect a deposit made at the CBCT, a factor not present in *Plant City*, the crediting of a deposit made at a CBCT is subject to receipt and verification at the main office. The physical receipt of deposits by the machines, notwithstanding contractual arrangements, constitutes "receipt of deposits" under § 36(f) as interpreted in *Plant City*. The additional factor of immediate transmission of deposit-related information made possible by the on-line communication between the terminal and the banks' main computer only buttresses the conclusion that the deposit occurs at the time of receipt at the terminal rather than at the bank.

Defendants attempt to attribute significance to the distinction between off-line CBCTs, such as the one found in *Bloom, supra,* and on-line CBCTs such as those in the instant case. The reality of virtually immediate recording of an on-line CBCT initiated deposit transaction by the bank's main computer obviously makes the CBCT a more sophisticated and useful place for receiving deposits than were the receptacle and the armored messenger car in *Plant City* or the off-line CBCT in *Bloom.* This does not, however, alter the location of the place where the deposit is made by the customer.[5] The logical extension of defendants' argument would require a finding that deposits received at an off-premises building occupied by bank personnel who took them and wired the information regarding them to the main office's computer, were made at the main office if, pursuant to contract, funds were not finally credited to the customer's account until the main office received and verified the deposit. In consequence, a manned physically remote branch would not constitute a branch under Section 36(f). Under *Plant City* and, in fact, deposits entered at CBCTs are made at the terminal rather than at the bank and the CBCT is, accordingly, a branch.

Relying on a statement in the District Court's decision in *Bloom, supra,* defendants argue that the transfer of funds between two accounts of the same customer does not constitute a deposit. They contend that authorizing the bank to make such transfers entails no physical exchange of funds and is pure communication which can be accomplished in the same manner by telephone or mail.[6] We disagree.

After the customer's requested transfer of funds between accounts has been authorized by the bank's main computer

---

**5.** In this connection, defendants rely on *Bloomfield Federal Loan Ass'n v. American Community Stores Corp.,* 396 F.Supp. 384, 387–88 (D.Neb.1975). The Remote Service Units (RSUs) in *Bloomfield* were capable of transferring funds, withdrawing from savings accounts, depositing in savings accounts, receiving payments related to loans, and other related financial services. The Court held that the regulation governing branches by federal savings and loan associations, 12 CFR § 545.-14, were not applicable to RSUs due to their *sui generis* characteristics as a means of communication. Noting the non-applicability of the National Bank Act's provisions to federal savings & loan associations and the different

standard employed by the Federal Home Loan Bank Board in refusing to authorize branching, the Court held that RSUs were not branch savings and loans. Because of the existence of different standards, this holding is not persuasive authority for a similar holding in the instant case.

**6.** The defendants also point to Ill.Rev.Stat., Ch. 16½ § 102, which excludes from the definition of branch "any place at which only records . . . are made, posted, or kept." The functions of a CBCT are generically dissimilar to those of places used for information storage. Records are neither made, posted, nor kept at CBCTs.

he receives a receipt which verifies the transfer. The customer is thus able to accomplish a deposit of funds into his savings or checking accounts at a place remote from the bank's main premises. Furthermore, a qualitative difference exists between the mere telephoning or mailing of the requested transfer. Since the CBCT is clearly a "place" within the Supreme Court's language in *Plant City*, the transfers must be deemed to be consummated by the customer at a place provided by the bank other than the bank's main premises. What happens simply is that the customer withdraws funds from one account, an act not covered by § 36(f), and deposits them in another account, a transaction constituting branch banking under that section.

Even considering the somewhat complicated clearance process which precedes the main bank computer's authorization of the transfer, the deposit obviously initiates at the CBCT, and the receipt supplied by the CBCT indicates that the transfer has been consummated. Immediately thereafter, the customer's EFTS master record is updated and the transfer is complete. In the case of mailing or telephoning, no place owned by the bank is involved. The customer simply mails or telephones the requested transfer from an indeterminate location. The defendants' attempts to use bank-by-mail and bank-by-telephone analogies breaks down under § 36(f)'s two-pronged standard. The off-premise CBCT is a *place* owned by the bank where deposits are received in the form of a customer's withdrawal of money from his checking, savings, or credit card account into his checking or savings account. These conclusions apply equally to deposits effectuated at the POS terminals.[7]

Payments on installment loans or credit card accounts, however, do not constitute deposits inasmuch as they are payments on existing loan obligations or credit card account balances and not the deposit of funds in an account which is subject to future withdrawals by the customer.

## B. *Cashing Checks*

The plaintiff urges that, using the practical substantive approach which *Plant City* requires, the withdrawals permitted at CBCTs must be considered the cashing of checks. He contends that a check is whatever is recognized by the bank as an order. We do not agree.

The Uniform Commercial Code, which has been adopted in Illinois, provides at 3–104(2), Ill.Rev.Stat. Ch. 26 § 3–104(2), that a check is a negotiable instrument which is drawn on a bank and payable on demand. Section 3–104 defines a negotiable instrument as a writing which is signed by the maker or drawer, contains an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by Article 3, is payable on demand or at a definite time and is payable to order or to bearer. Negotiability, the transferability of the instrument (check) from the payee or holder to a third party, is the essential characteristic of a check.

The insertion of a card into a CBCT to secure $25 packets of cash up to $100 is not cashing a check within the meaning of the UCC or in the common understanding of what constitutes check cashing. No written instrument exists and no third party designation enters into the transaction. A withdrawal at a CBCT is the functional equivalent of cashing a check only with respect to a bearer instrument presented for payment by the maker. Even this analogy breaks down when the withdrawal is made from the customer's savings account upon which no checks could be written or when the cash is obtained through use of a credit card. The limited similarity between a CBCT cash with-

---

7. No substantive difference lies in the distinction between deposits that are made directly into an account because of money or checks placed into the CBCT, and those credited immediately to the customer's account by virtue of transfer from a retailer's account to a customer's account following the customer's presentation of a check to the retailer.

drawal and the maker's cashing of a bearer instrument is not sufficient to transform the obtaining of cash by withdrawal from a checking or savings account or through use of a Master Charge card into cashing checks within the meaning of § 36(f). The foregoing analysis is equally applicable to withdrawals consummated at POS terminals.

## C. Lending Money

Relying on *Bloom*, defendants argue that: 1) a cash advance of a credit card is not a loan within the meaning of § 36(f) because there is no functional difference between the use of a credit card to obtain goods and services and its use to obtain cash; 2) since no discretion is exercised by the bank when cash is dispensed at CBCTS and since the extension of credit involves a discretionary decision by the lender, the receipt of cash from a credit card account does not constitute a loan; 3) the loan is made when the customer's line of credit on the account is approved and not at the time of withdrawal which, in any event, is subject to verification at the bank; and 4) that at Dominick's the insertion of the store's employee as an intermediary removes any possibility of it being a loan by the bank.

The initial difference in the function of a credit card to obtain cash at a CBCT and its use to obtain goods and services from a merchant is that the latter engenders the running of interest from the end of a predetermined period for payment, usually 25 or 30 days after receipt of a statement, while the former causes interest to run from the time of withdrawal. Although a loan may be generally defined as a contract whereby one delivers money to another who agrees to return an equivalent sum at a future time, a significant aspect of a loan is the running of interest, the charging of which is a uniform custom in the banking industry. See 7 Zollmann, *Banks and Banking*, §§ 4823, 4825.

The contracts underlying the issuance of credit cards with respect to cash advances are, in effect, agreements to make small loans to the customer at some future presentation of a valid card. That agreement does not transfer any funds and, therefore is not a loan as urged by defendants. Nor is interest charged with the opening or establishing of a line of credit. The funds are transferred and interest commences when the CBCT disburses the requested number of $25 packets up to $100.00. That is when and where the loan is made. Many holders of bank credit cards never use them to obtain funds and, therefore, never make any loans with them although the line of credit is available.

It should be noted that, while only a maximum of $100.00 may be borrowed on any given day, the total amount which may be borrowed over a series of days is the maximum line of credit previously established.

It is not accurate, therefore, to contend that the establishment of the line of credit constitutes the making of the loan since, if funds are borrowed on more than one day against the available maximum, the additional funds will not be delivered and interest will not start to run on them until the later date or dates.

The simple use of a credit card to obtain goods or services from a merchant is distinguishable from its use at a CBCT to obtain cash on two grounds. First, the bank has not established a *place* for the dispensing of the goods or services pursuant to the use of the credit card. Second, the use of the credit card to obtain goods or services from a merchant does not commence the running of interest. If payment is made within the specified payment period, no interest accrues at all.

In addition to securing goods or services through use of the bank charge card, a holder may also obtain cash at a retail store CBCT installation. Thus, loans are also made at POS terminals. The participation of the store's employee does not cause a significant difference in the operation of these manned terminals and the unmanned CBCTs. Instead of the customer operating the machine, he

presents his card to the store's employee who completes the operation. Although the actual funds received upon withdrawal from the customer's credit card account come from the store's cash on hand, the appropriate debit and credit entries are made to the customer's and store's accounts, and interest immediately starts to run on the customer's loan. Accordingly, POS terminals, as well as CBCTs, are places where money is lent to the bank's customers within the meaning of § 36(f).

## IV. DEFENDANTS' ADDITIONAL CONTENTIONS

■ Additional arguments put forth by defendants include: 1) the competitive equality between National and State Banks will not be disrupted by CBCTs; 2) the Illinois Commissioner of Banks is permitting practices analogous to CBCT banking to exist in Illinois; and 3) the McFadden Act should not be interpreted in such a way as to preclude the introduction into the banking system of new computer technology designed to provide banking customers with greater convenience in banking.

### A. *Competitive Equality*

Defendants argue that, because EFTS technology would be available to state banks through franchising agreements with the large national banks and because small banks will need to use these systems if they are to avoid losing their share of the market to competing non-bank financial and non-financial institutions, the local monopolies of small state banks, which Illinois anti-branching laws seek to protect, will be enhanced and not weakened or destroyed by the introduction of CBCTs and their use by state banks under franchise from the large national banks. In addition, they contend that, since the state of Illinois, unlike the state of Florida in *Plant City*, already permits substantial off-premises activities, bank-by-mail, bank-by-telephone, and chain banking, the operation of CBCTs, which are merely a more technologically advanced form of these banking activities, will not result in any competitive advantage to national banks and, therefore, under *Plant City* and the underlying purposes of the McFadden Act, the Act's definition of branch should not be applied to CBCTs.

The first part of defendants' argument is answered by reference to the purpose of the McFadden Act. As pointed out by the Supreme Court in *Walker Bank, supra,* the legislative history indicates that Congress intended "to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." Since the Congress did not intend to give national banks a competitive advantage, it left the decision of whether to allow branching to the states, permitting national banks to branch to the extent allowed by the state. The legislative history of the McFadden Act does not express a concern for the competitive position of state banks *vis a vis* other state financial and non-financial institutions. Such a concern may not be used to permit national banks to engage in branching activities where states do not permit it.

The second part of defendants' argument is answered by reference to the clear language of the statute:

> (c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: . . . at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

No Illinois statute specifically grants Illinois banks authority to have electronic branches. Accordingly, if, as we are compelled to conclude, CBCTs are branches, the foregoing language forecloses national banks from employing them in Illinois.

In addition, although inquiry into the impact of CBCTs on the competitive position of state and national banks is relevant in construing "branch", it is not a separate test for the existence of a branch. Rather, it is, at most, an adjunctive inquiry, buttressing or diminishing the finding that a bank's deposit, check cashing or lending activities constitute branching. The Supreme Court in *Plant City* did not make a factual analysis of banking activities permitted in Florida that could be considered competitive with the messenger and receptacle services in question. It simply held (396 U.S. p. 136, 90 S.Ct. p. 345):

> Because the purpose of the statute is to maintain competitive equality, it is relevant in construing "branch" to consider, not merely the contractual rights and liabilities created by the transaction, but all those aspects of the transaction that might give the bank an advantage in its competition for customers. Unquestionably, a competitive advantage accrues to a bank that provides the service of receiving money for deposit at a place away from its main office; the convenience to the customer is unrelated to whether the relationship of debtor and creditor is established at the moment of the receipt or somewhat later.

A similar competitive equality analysis here compels the same conclusion. National banks using CBCTs will have a competitive advantage over state banks not currently permitted to use them. It, therefore, reinforces our finding that CBCTs are branches performing banking activities within the meaning of § 36(f).

### B. *Analogous Illinois Practices*

Defendants contend that the Commissioner's approval of the Check-Mate system, which has been instituted by state savings and loan associations in cooperation with state banks validates the CBCTs under Illinois law. Also, defendants complain that the Commissioner has taken no action with respect to the Heritage Moneymatic 365.

The Check-Mate system allows savings and loans depositors to obtain a free-checking account in a designated Illinois state bank. The initial deposit to the state bank checking account is made through the S&L to the bank. Subsequent deposits may be made either through the S&L or directly to the bank. The Commissioner argues that the S&L is an agent of the customer. Defendants, however, contend that it is an agent of the bank. The Commissioner held that these activities do not constitute branching under state law.

The question of agency is interesting but irrelevant. The Check-Mate system is clearly distinguishable from CBCTs. The latter consists of facilities owned by the bank to accomplish two of the three activities set out in § 36(f). It cannot be seriously argued that the S&L is a branch of the bank or vice versa. We assume that, if national banks desire to establish similar arrangements with S&Ls, they may do so. It does not follow, however, that they may therefore set up CBCT branches.

The foregoing analysis applies equally to the Moneymatic 365 system whereby a customer of any one of the several Heritage Group banks may withdraw money from his checking account by the insertion of his Moneymatic 365 card into a machine located on the premises of any of the other listed banks. Not only, as we have held, do such withdrawals not constitute check-cashing, but, as the presence in the group' of the First National Bank of Lockport indicates, national banks are not precluded from engaging in these activities.

### C. *New Technology and Development*

Finally, the defendants urge that we should interpret the McFadden Act in such a way that banking customers may enjoy the conveniences available through new electronic computer technology. They also suggest that the recent branching of federally chartered savings and loans in Illinois and the expansion of their services made it appropriate to permit national banks to provide the addi-

tional services to their customers available through CBCTs so as to enable the banks to compete with the savings and loans. The Comptroller in his opinion holding CBCTs not to be branches stressed the competition of branching savings and loans as one of the reasons why national banks needed to utilize CBCTs to maintain their competitive position.

We are sympathetic to the substantive considerations underlying both arguments. The public should be permitted, unless other and superior considerations preclude it, to enjoy the benefits of modern technology. Moreover, we are well aware, having written the opinion in *Lyons Savings & Loan Ass'n v. Federal Home Loan Bank Bd.*, 377 F.Supp. 11 (N.D.Ill.1974), which held that the Federal Home Loan Bank Board had the power, under its enabling legislation, to grant branch charters to federal savings and loan associations in Illinois, that savings and loan branches are burgeoning in this state, and that banks may very well be suffering competitively.

Unfortunately, the language of the McFadden Act establishes a relatively simplistic test as to what constitutes a branch bank. It was enacted in 1927 at a time when banks performed far fewer functions and services than they do today. The three services, the performance of any one of which constitutes a branch, represent a fraction of the myriad of activities carried on daily by even the smallest national bank.

There were, of course, no electronic computers in 1927 and no savings and loans. The Home Owners Loan Act was not passed until 1933.

The problem which the McFadden Act sought to solve was the increase in branching of state banks in those states which permitted them to have branches while national banks were not allowed branches regardless of what state law permitted state banks to do. According-

ly, Congress adopted a simple formula. If a particular state authorizes branches for state banks, the Comptroller may permit national banks in that state to have branches. What constitutes a branch, however, was defined by the Congress.

The 1927 McFadden Act is, we believe, obsolete and should be reexamined in the light of current competitive conditions and modern technology. Its language is, however, clear and unambiguous. If a facility owned by a bank is a place "at which deposits are received, or checks paid, or money lent," it is a branch under the Act. However desirable CBCTs may be in providing better service to bank customers and enabling banks to compete with branching savings and loans, it is clear, as previously indicated, that they receive deposits and lend money. They are, therefore, branches. Whether or not they should be is a question properly within the province of the Congress and not the Courts.

### Conclusion

In the light of the foregoing, we hold that the functions performed by CBCTs, both unmanned and manned, constitute making a deposit or lending money within the meaning of 12 U.S.C. § 36(f) with the exception of cash withdrawals from checking or savings accounts and payments on installment loans and credit card accounts. Additionally, we hold that cash withdrawals as presently effectuated at CBCTs do not constitute cashing checks. Since under *Plant City, supra*, the bank's maintenance of a *place*, off-premises, where either deposits are made, checks are cashed, or money is lent, amounts to branch banking, CBCTs must be so characterized. Accordingly, defendants' motion for summary judgment is denied. Plaintiff, on the other hand, is entitled to summary judgment and a permanent injunction against defendants' use of CBCTs either manned or unmanned.