WILSHIRE OIL COMPANY OF
TEXAS, Petitioner,

v.

BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent.

No. 81–1560.

United States Court of Appeals,
Third Circuit.

Argued Oct. 26, 1981.

Decided Dec. 31, 1981.

Rehearing and Rehearing In Banc
Denied Feb. 1, 1982.

John W. Dickey (argued), Jeffrey S. Parker, Sullivan & Cromwell, New York City, and Alan V. Lowenstein, Gregory B. Reilly, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N. J., for petitioner.

J. Virgil Mattingly, Jr. (argued), Associate Gen. Counsel, Bronwen Mason, Senior Counsel, Board of Governors of the Federal Reserve System, Washington, D. C., for respondent.

Before ADAMS, VAN DUSEN and SLOVITER, Circuit Judges.

OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

This matter comes before us as a petition for review of a cease and desist order of the Board of Governors of the Federal Reserve System (the "Board"). The Board found petitioner, Wilshire Oil Company of Texas ("Wilshire"), to be in violation of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. §§ 1841–1850 (1976) (the "BHC Act"). The only contested issue is whether Wilshire's subsidiary, the Trust Company of New Jersey ("TCNJ"), is a "bank" under the BHC Act. Wilshire concedes that if TCNJ is a "bank," then Wilshire is a "bank holding company" engaged in both banking and non-banking activities in violation of § 4(a)(2) of the Act, 12 U.S.C. § 1843(a)(2). We affirm the Board's conclusion that TCNJ is a "bank" under the BHC Act, and

deny the Petition for Review seeking to terminate the cease and desist order against Wilshire.

## I. *Statutory Background*

The Bank Holding Company Act, 12 U.S.C. §§ 1841–1850 (1976), was enacted to prevent the concentration of commercial banking activities and to separate banking from commerce.[1] Section 4 of the BHC Act generally restricts the non-banking activities of "bank holding companies," defined in § 2(a)(1) as companies which have "control over any bank." As originally enacted, the BHC Act restricted the non-banking activities of only companies that controlled more than one bank, but in 1970 Congress amended the Act so as to apply also to one-bank holding companies. Under § 4(a)(2), these one-bank holding companies were given 10 years, until December 31, 1980, either to divest their non-banking operations or to cease being bank holding companies. 12 U.S.C. § 1843(a)(2) (1976).

Congress has twice modified the definition of "bank" under the BHC Act. The original definition included all national banks, state banks, and savings banks. Act of May 9, 1956, c. 240, § 2(c), 70 Stat. 133. In 1966, the definition was narrowed to encompass only those domestic institutions which "[accept] deposits that the depositor has a legal right to withdraw on demand." Act of July 1, 1966, Pub.L. 89–485, § 3, 80 Stat. 236, 237. The current definition was enacted in 1970:

> "(c) 'Bank' means any institution ... which (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans."

12 U.S.C. § 1841(c) (1976).

The Board of Governors of the Federal Reserve System is charged with the administration of the BHC Act, and § 5(b) authorizes the Board "to issue such regulations and orders as may be necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions thereof." 12 U.S.C. § 1844(b) (1976). Under §§ 8(b)(1) & (3) of the Financial Institutions Supervisory Act of 1966 ("FISA"), 12 U.S.C. §§ 1818(b)(1) & (3) (Supp.1980), the Board also has the power to institute cease and desist proceedings whenever it has reason to believe that the BHC Act is about to be violated.

## II. *The Facts*

Wilshire Oil Company of Texas, the petitioner here, is engaged in the production of oil and natural gas, both directly and through its subsidiaries. Until November 1980, Trust Company of New Jersey, one of Wilshire's subsidiaries,[2] was concededly a "bank" under the BHC Act's current definition; TCNJ "(1) accept[ed] deposits that the depositor [had] a legal right to withdraw on demand, and (2) engage[d] in the business of making commercial loans." 12 U.S.C. § 1841(c) (1976).[3] Because Wilshire controlled a "bank," it was a bank holding company required by § 4(a)(2) either to divest its oil and gas business or to cease being a bank holding company before December 31, 1980.

Beginning in 1977, the Board frequently urged Wilshire to decide how it would come into compliance with the BHC Act before the December 31, 1980, deadline. Wilshire suggested several possible ways of complying with the Act, but made no firm proposal until November 1980. On November 3, 1980, less than two months before the final deadline, Wilshire notified the Board that it intended to keep both its oil and gas business and its interest in TCNJ. Wilshire announced that it would comply with the BHC Act by changing TCNJ into a "nonbank" under the Act.

On November 5, 1980, TCNJ sent a notice to its depositors that:

---

1. *See* S.Rep.No. 1095, 84th Cong., 1st Sess. 2 (1955), *reprinted in* [1956] U.S.Code Cong. & Ad.News 2482, 2483.

2. Wilshire owns 90% of the shares of TCNJ (App. 129).

3. Because TCNJ's deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"), TCNJ is also subject to federal regulations issued by the FDIC.

"The Trust Company of New Jersey, beginning November 20, 1980 reserves the right to require 14 days notice prior to withdrawal from its transactional accounts. The Trust Company has never exercised its right to require notice and has no intention of exercising a notice provision on any type of account."

(App. 294). TCNJ also modified its account agreement forms for its newly-named "transactional accounts" to include this reservation of the right to require notice for withdrawal. Except for this reservation, TCNJ has not changed any of its banking operations, and the reservation has had no practical effect on the institution. Specifically, TCNJ has not altered its commercial lending activities.

Wilshire claims that this reservation of a right to require notice means that TCNJ's depositors no longer have "a legal right to withdraw [their deposits] on demand," and therefore TCNJ is not a "bank" under the BHC Act definition in § 2(c) and Wilshire is not a "bank holding company" under § 2(a)(1). The Board disagreed and issued a Notice of Charges against Wilshire, its directors, and certain officers on December 9, 1980, pursuant to §§ 8(b)(1) & (3) of FISA, 12 U.S.C. §§ 1818(b)(1) & (3). The Board also directed that a formal administrative hearing be held to determine whether Wilshire would be in violation of the BHC Act on January 1, 1981.

On December 31, 1980, Wilshire transferred all of its TCNJ shares to an independent trustee. The operations of the two companies were temporarily separated, and all interlocking officer and director relationships were terminated.

After the December 31, 1980, deadline had passed, the Board amended its December 9 Notice of Charges and issued a Notice of Assessment of Civil Money Penalties. This latter notice, issued on January 6, 1981, under §§ 8(b)(1) & (3) of FISA and § 8(b) of the BHC Act, charged Wilshire, its directors and certain officers, with a violation of § 4(a)(2) of the BHC Act.

The administrative proceedings culminating in the Board's order now under review were governed by an agreement between Wilshire and the Board. In this agreement, Wilshire waived its right to a formal administrative hearing, and both parties agreed that "the sole issue between the parties is the legal issue whether TCNJ is a bank under the BHC Act and Wilshire is a bank holding company under the BHC Act and whether TCNJ's reservation of the right to 14 days' advance notice of withdrawal from deposits at TCNJ caused TCNJ to become a nonbank for purposes of the BHC Act" (App. 36–37). The agreement also ensured the temporary separation of Wilshire's and TCNJ's operations, incorporating the terms of the trust established by Wilshire on December 31, 1980, pending final judicial review of the Board's order.[4]

The Board of Governors of the Federal Reserve System issued its Final Decision and Order on April 2, 1981. The Board concluded that TCNJ was a "bank" within the meaning of the BHC Act, that Wilshire was a bank holding company that was required to divest its nonbanking operations by December 31, 1980, and that, since Wilshire did not do so, it was in violation of § 4(a)(2) of the Act. Wilshire then petitioned for review.

### III. *Statutory Language*

The basic thrust of Wilshire's argument is that when Congress has written precise and detailed definitions in a statute, the Board cannot expand its own regulatory power by applying the substantive terms of the statute in a setting where the plain definitional requirements are not met. Wilshire relies on the Supreme Court's admonition regarding statutory interpretation: " '[t]he starting point in every case involving construction of a statute is the language itself.' " *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60

---

4. The Board also agreed to withdraw, with prejudice, the charges against the directors and certain officers of Wilshire. Wilshire agreed that if it were found in violation of the BHC Act, it would pay a civil penalty of $1,000, per day for the period between January 1, 1981, and the day Wilshire came into compliance with the Act.

L.Ed.2d 980 (1979), *quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1934, 44 L.Ed.2d 539 (1975) (Powell, J., concurring).

Wilshire argues that TCNJ's reservation of the right to require 14 days' notice of withdrawal means that the holders of its "transactional accounts" no longer have a *legal* right to withdraw their deposits on demand. Because the depositors lack this legal right, Wilshire contends, TCNJ does not fit within the literal definition of a "bank" in § 2(c) of the Act, and Wilshire is not a bank holding company subject to the Board's regulatory powers.

The Board concluded in its Final Order and Decision that "TCNJ is a 'bank' within the meaning of the section 2(c) of the BHC Act because it accepts deposits that the depositor has the legal right to withdraw on demand and engages in the business of making commercial loans . . ." (App. 236). The Board considered the statement sent by TCNJ to its depositors reserving the right to require notice of withdrawal, and noted that this announcement stated that TCNJ "has no intention of exercising" this reserved right. The purpose of this disclaimer of intention, the Board assumed, was to induce TCNJ's checking account customers not to withdraw their deposits from TCNJ. Referring to § 90 of the Restatement (Second) of Contracts on promissory estoppel,[5] the Board stated "it appears that a depositor who relies to his detriment on TCNJ's representation of intent not to invoke the prior notice requirement may have a legally enforceable right in a court of law (on a breach of contract theory or on general equitable principles) to prevent TCNJ from asserting any prior notice requirement" (App. 228).

Wilshire disagrees and asserts that TCNJ's letter to its depositors of November 5, 1980, was effective in reserving a right to require advance notice. It argues that no promise was made by TCNJ that it would never exercise the right, nor was there any voluntary waiver of the right. Wilshire supports this contention by noting that the disclaimer of any intention to exercise the right was sent to the depositors in the same notice that reserved the right in the first place. This makes clear to depositors, Wilshire argues, that TCNJ did not promise to forego its right, but merely stated its intention not to exercise the right in the foreseeable future. Wilshire also points to the documents used by TCNJ to open new accounts since November 1980 which contain the reserved right to require notice, but not the disclaimer of intention to exercise that right (App. 281, 283). TCNJ has not given the holders of these accounts any assurance that it will not require them at some point in the future to give 14 days' advance notice of withdrawal.

We do not need to decide, however, if the Board was correct in its conclusion that TCNJ's depositors still have a legal right to withdraw their funds on demand despite TCNJ's reservation of the right to require advance notice.[6] While the language of the BHC Act may be the starting point in construing the statute, we may look beyond the plain language, if necessary, to ensure that application of the literal terms does not destroy the practical operation of the statute. The Supreme Court has cautioned:

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of

---

**5.** Section 90 of the Restatement (Second) of Contracts provides:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

Restatement (Second) of Contracts § 90 (1981).

**6.** We note that the Board does not rely heavily on the argument that TCNJ falls within the literal definition of the term "bank" in the statute. The Board stated that "it *appears* that a depositor . . . *may have* a legally enforceable right" to withdraw on demand (App. 228; emphasis added).

the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words."

*United States v. Amer. Trucking Ass'ns.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) (footnotes omitted). *Accord, United States v. Rutherford*, 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979). In reviewing the Board's determination, we must also consider the Supreme Court's instruction in *United States v. Rutherford, id.*, that "the construction of a statute by those charged with its administration is entitled to substantial deference." *Id.* at 553, 99 S.Ct. at 2476. With these considerations in mind, we turn to the Board's analysis of the congressional purpose in enacting the BHC Act and its amendments.

### IV. *Legislative History*

■ The legislative history discussed in the Board's Final Decision and Order shows that Congress intended to include an institution such as TCNJ under the definition of "bank" in the BHC Act. Congress enacted the BHC Act "to prevent possible abuses related to the control of commercial credit" by separating commercial banking from commerce. S.Rep.No. 91–1084, 91st Cong., 2d Sess. 24 (1970), *reprinted in* [1970] U.S. Code Cong. & Ad.News 5519, 5541. Congress found it necessary to amend the definition of "bank" twice, as it sought a definition that would serve the purposes of the statute, without unnecessarily restricting banks that did not engage in commercial credit transactions.[7]

The legislative history indicates that the original definition of "bank" in the BHC Act was considered too broad, and the 1966 amendment to the definition, which generated the first half of the current definition, was passed to remedy this problem:

"Section 2(c) of the [original] act defines 'bank' to include savings banks and trust companies, as well as commercial banks. The purpose of the act was to restrain undue concentration of control of commercial bank credit, and to prevent abuse by a holding company of its control over this type of credit for the benefit of its nonbanking subsidiaries. This objective can be achieved without applying the act to savings banks, and there are at least a few instances in which the reference to 'savings bank' in the present definition may result in covering companies that control two or more industrial banks. To avoid this result, the bill redefines 'bank' as an institution that accepts deposits payable on demand (checking accounts), the commonly accepted test of whether an institution is a commercial bank so as to exclude institutions like industrial banks and nondeposit trust companies."

S.Rep.No. 1179, 89th Cong., 2d Sess. 7 (1966), *reprinted in* [1966] U.S.Code Cong. & Ad.News 2385, 2391.

The Senate Report shows that the 1966 definition of a "bank" as "any institution . . . which accepts deposits that the depositor has a legal right to withdraw on demand" was meant to include those institutions that accept "deposits payable on demand (checking accounts)." *Id.* Traditionally, the ability to withdraw deposits on demand has been associated with non-interest bearing checking accounts, while a reservation of a right to require advance notice of withdrawals has been a condition of

---

7. Cf. *Otero Savings and Loan Ass'n v. Federal Home Loan Bank Board*, 665 F.2d 279 (10th Cir. 1981), a case involving the interpretation of another frequently amended federal banking statute, 12 U.S.C. § 1832(a) (concerning interest-bearing checking accounts). Judge McKay noted in his concurrence that because "the con-

gressional legislation evolved in a piecemeal fashion so that sometimes one enactment overlapped or did not quite match another . . . . we must emphasize the objectives of Congress without overemphasizing the individual steps taken to achieve those ends." *Id.* typescript op. at 1 (McKay, J., concurring).

interest-bearing savings accounts. *See* Final Decision and Order of the Board, at 14, App. 230; 12 U.S.C. §§ 371a & 1828(g) (Supp.1980) (generally forbidding the payment by insured banks of interest on demand deposits).[8] It is reasonable to conclude, as did the Board, that the reason why Congress did not consider in its definition of "bank" an institution such as TCNJ that offers accounts that are non-interest bearing and *not* accessible on demand was simply because such accounts were not commonly used.[9] Congress did not choose the words "accepts deposits that the depositor has a legal right to withdraw on demand" because it was concerned with the distinction between a depositor's *legal* right to withdraw on demand and the ability *in practice* to withdraw on demand. The more reasonable interpretation of why Congress selected those terms is that stated in the Senate Report, *supra*: Congress was merely adopting "the commonly accepted test of whether an institution is a commercial bank." *Id.*[10]

This interpretation of the legislative history is reinforced by the Senate Report to the 1970 amendment of the BHC Act, which once again changed the definition of "bank" in § 2(c) of the Act. This amendment added the second element of the current definition: whether the institution "engages in the business of making commercial loans."

12 U.S.C. § 1841(c)(2). The Senate Report shows clearly that, in framing the definition of "bank," Congress was not as concerned with the precise legal rights of a bank's depositors as it was with the practical effect of the Act on commercial lending practices:

> "The definition of 'bank' adopted by Congress in 1966 was designed to include commercial banks and exclude those institutions not engaged in commercial banking, since the purpose of the act was to restrain undue concentration of commercial banking resources and to prevent possible abuses related to the control of commercial credit. However, the Federal Reserve Board has noted that this definition may be too broad and may include institutions which are not in fact engaged in the business of commercial banking in that they do not make commercial loans. The committee, accordingly, adopted a provision which would exclude institutions that are not engaged in the business of making commercial loans from the definition of 'bank.'"

S.Rep.No. 91–1084, 91st Cong., 2d Sess. 24 (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 5519, 5541.

This legislative history shows that TCNJ falls within the category of institutions that Congress intended to include in its defini-

---

**8.** Even though the 1980 Deregulation Act, 12 U.S.C.A. § 1832 (Supp.1981), allows financial institutions to offer to individuals and non-profit corporations interest-bearing accounts that are accessible by negotiable instrument, the regulations mandate that the institutions still reserve the right to require advance notice for withdrawals. *See* 12 C.F.R. Parts 217, 329 (1981). We note that this reservation of a right to require advance notice is once again associated with interest-bearing accounts, unlike TCNJ's non-interest bearing transactional accounts.

**9.** The Board, in its Final Decision and Order, at 14 n.11, recognized that federal law does not *require* the payment of interest on savings accounts that are subject to a reservation of the right to require notice of withdrawal (App. 230 n.11). We emphasize that financial institutions typically do pay interest on accounts subject to this reservation, because it indicates the

factual context in which Congress defined the term "bank."

**10.** The General Counsel of the Federal Deposit Insurance Corporation (FDIC) has concluded that TCNJ's corporate transactional accounts are in fact "demand deposits" under the FDIC regulations. He determined that these accounts are neither "savings accounts," since they are accessible by negotiable instrument, *see* 12 C.F.R. §§ 217.5(c) & 329.5(c) (1981), nor "time deposits" because they have no fixed maturity nor required notice of withdrawal of 14 days or more, 12 C.F.R. §§ 217.1(d) & 329.-1(d) (1981). Therefore, since a "demand deposit" is defined as a deposit that is neither a savings deposit nor a time deposit, 12 C.F.R. §§ 217.1(a) & 329.1(a) (1981), TCNJ's transactional accounts must be "demand deposits." Letter of Frank L. Skillern to Neal L. Petersen, March 3, 1981 (App. 497–500).

tion of "bank" in the BHC Act. In practice, TCNJ's "transactional accounts" are "demand deposits," because, as TCNJ has notified its customers, it has no intention of exercising its right to require advance notice of withdrawals.[11] There is no dispute that TCNJ makes commercial loans.[12] Together, these factors indicate that the possibility of abuse of commercial credit exists, and TCNJ is the type of institution that Congress meant to include within the definition of a "bank" under § 2(c).

## V. The Board's Power to Prevent Evasions of the Act

Congress specifically instructed the Board to look to the purposes of the BHC Act in administering its terms. Section 5(b) of the Act provides:

> "The Board is authorized to issue such regulations and orders as may be necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions thereof."

12 U.S.C. § 1844(b) (1976).[13] The Board found, and Wilshire does not contest on appeal, that TCNJ has made no functional change in its banking operations, and the reservation of a right to require notice has had no practical effect on the bank's depos-

its. Given that the Act admittedly applied to TCNJ before November 1980 because of its commercial activities, the Board appropriately determined that it must continue to apply the Act to TCNJ to "carry out the purposes" of the BHC Act.

■ Section 5(b) also permits the Board to act to "prevent evasions" of the BHC Act. Wilshire admitted at oral argument that the purpose of the reservation of the right to require advance notice was to take TCNJ outside the BHC Act.[14] Because we approve the Board's finding that the reservation of the right to advance notice served no banking purpose, but was made merely to withdraw TCNJ from the coverage of the BHC Act, we accept the Board's order as necessary to "prevent evasion" of the Act. The Board explained its conclusion:

> "[A]ny determination by the Board to the effect that TCNJ's notice to its demand deposits customers terminates TCNJ's status as a bank under the BHC Act would serve to nullify the entire regulatory framework of that Act. If a bank holding company is permitted to escape its obligations under the Act without making any functional change in its operations simply by causing its subsidi-

---

**11.** The deposit slips used for these accounts are still labeled for "checking" accounts, and TCNJ referred to its deposits as "demand deposits" in its Report of Condition for the last quarter of 1980, filed with the FDIC on January 27, 1981 (App. 479).

**12.** TCNJ had $89,067,000. in commercial and industrial loans outstanding as of December 31, 1980. This information was reported to the FDIC on January 27, 1981, on a standardized form labeled "Consolidated Report of Condition (*Commercial Bank*)" (App. 479; emphasis supplied).

**13.** Wilshire seeks to minimize the significance of § 5(b) of the BHC Act by pointing to the specific authority given the Board under § 2(e) to further define the term "successor" to prevent evasions of the Act. 12 U.S.C. § 1841(e) (1976). Wilshire argues that because Congress did not also specifically allow the Board to further define "bank," the Board's power to do so is limited by negative implication.

A more plausible inference that may be drawn from the specific provision of § 2(e) is

that Congress was able to anticipate problems arising under the definition of "successor," but was uncertain what other terms of the statute could be manipulated so as to evade the Act. Congress enacted § 5(b) as a catch-all, to cover any other evasions attempted through activity conforming to the letter, but not the spirit, of the statute. *Cf. American Trucking Ass'ns. v. United States*, 344 U.S. 298, 309–10, 73 S.Ct. 307, 314, 97 L.Ed. 337 (1953) (rejecting as "a reasonable canon of interpretation" the notion that "the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected").

**14.** Both the "Resolutions of Wilshire Oil Company of Texas," App. 290–91, and the "Resolution for the Trust Company of New Jersey," App. 292–93, which approved the reservation of the right to require notice, indicate that the reservation was made to escape the requirements of the BHC Act and would have little, if any, effect on TCNJ's operations.

ary bank(s) to send a notice to customers holding demand deposits reserving a right to notice of prior withdrawal, circumvention of the Act's substantive requirements on a large scale is likely." Final Decision and Order of the Board, at 19, App. 235 (footnote omitted). Since acceptance of Wilshire's position would allow evasions of the Act, we agree with the Board that § 5(b) "enables the Board to prohibit activities that are technically outside the literal terms of the Act in order to prevent a clear evasion of the purposes of the Act." Final Decision and Order of the Board, at 19–20, App. 235–36.[15]

We find support for the Board's decision to look behind the form of TCNJ's activities to their substance in *First National Bank in Plant City v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). *Plant City* involved the definition of a "branch" bank under the McFadden Act of 1927, 12 U.S.C. § 36(f) (1976). This act permits national banks to establish branch banks only in states where state banks are allowed to branch. The Supreme Court was presented with the question of whether a national bank's armored car "mobile drive-in" service and a stationary, secured receptacle for deposits were "branches" under § 36(f) of the McFadden Act. Concluding that

§ 36(f) included within the definition of "branch" any place for receiving "deposits," the Court considered the effect of the national bank's agreement with its customers that the moneys delivered to the armored car and stationary receptacle were not deemed "deposited" until delivered at the bank.

The Court held that the armored car and stationary receptacle were "branches" within the definition in § 36(f), despite the bank's private, contractual arrangements with its customers. The Court found that "the contracts have no significant purpose other than to remove the possibility that the monies received will become 'deposits' in the technical and legal sense until actually delivered to the chartered premises of the bank." 396 U.S. at 136, 90 S.Ct. at 344. The Court ignored the bank's technical interpretation of the statutory definition and looked instead to the purpose of Congress in enacting the McFadden Act—to maintain competitive equality between state and national banks. *Id.* As the Court concluded:

"Here, penetrating the form of the contracts to the underlying substance of the transaction, we are satisfied that at the time a customer delivers a sum of money either to the armored truck or the stationary receptacle, the bank has, for all

---

**15.** We also reject Wilshire's analogy to the Board's approval of the actions taken recently by Gulf & Western Corp. to make a proposed subsidiary a "nonbank" under the BHC Act. Gulf & Western sought to acquire Fidelity National Bank ("FNB") through another subsidiary. In order to avoid the restrictions of the BHC Act, FNB divested itself of its commercial loan portfolio, and assured the Board that it would separate its demand deposit-taking functions from the commercial lending business of other Gulf & Western subsidiaries. Because FNB no longer makes commercial loans, it falls outside the literal terms of the second prong of the BHC Act's definition of "bank." The Board approved the Gulf & Western acquisition of FNB on March 12, 1981. *See* letter from James McAfee, Assistant Secretary to the Board, to Robert C. Zimmer, March 12, 1981, reprinted in American Banker, March 13, 1981, at 26 (App. 392–93).

Wilshire argues that the Board's decision in the Gulf & Western transaction indicates that it

is "entirely proper and lawful" (Reply Brief for Petitioner at 23) for a company to make changes in its subsidiary's operations so as to take the subsidiary out of the definition of "bank" in the BHC Act. Without expressing any opinion on the Board's action in the Gulf & Western case, we note the significant differences between the two cases.

In the Gulf & Western case, the Board found that FNB made a substantive change in its banking operations when it divested its commercial loan portfolio. Because FNB no longer controlled commercial credit, there was no longer the same danger of the abuses related to commercial banking that the BHC Act was designed to prevent. In the present case, however, TCNJ's reservation of a right to advance notice has no practical effect on the operation of the institution, and the purpose of the BHC Act is still threatened by Wilshire's control over TCNJ.

purposes contemplated by Congress in § 36(f), received a deposit."

*Id.* at 137, 90 S.Ct. at 345.

In the Wilshire case, the Board quite properly "penetrat[ed] the form of the contracts to the underlying substance of the transaction," *id.*, when it held that TCNJ's reservation of a right to require advance notice had no effect on TCNJ's status as a "bank" under the BHC Act. As in *Plant City*, TCNJ's reservation had "no significant purpose" other than to take TCNJ out of the literal definition of "bank" in the Act. Furthermore, the Board's power to look to the practical effect of the private transaction, as well as the purpose of Congress in enacting the statute, is even clearer here than in *Plant City*, because Congress specifically gave the Board the power to "carry out the purpose of [the BHC Act] and prevent evasions thereof." 12 U.S.C. § 1844(b) (1976).

### VI. *Conclusion*

The BHC Act was enacted to prevent the possibility of a holding company abusing its control over commercial bank credit for the benefit of its non-banking operations. Congress granted the Board the power to administer the Act, specifically authorizing the Board to consider this purpose in doing so. Because the Board's cease and desist order against Wilshire was within this authority granted to the Board in § 5(b) of the Bank Holding Company Act, we will affirm the Final Decision and Order of the Board of Governors of the Federal Reserve System and deny the Petition for Review.